Argued March 18, affirmed May 17, rehearing denied July 5, 1921.

## MANSKER *v.* ASTORIA.

(198 Pac. 199.)

**Cemeteries—Charter Amendment Held not to Divest City Council of
All Authority Over Cemetery.**

1. The power of the city council of Astoria over cemeteries under
Special Laws of 1855–56, page 4, Laws of 1876, page 117, and Charter,
Section 52, giving the council power to provide cemeteries and to
regulate the burial of the dead, found in Laws of 1899, page 761,
was not entirely divested by the charter amendment of 1910, which
declared that the power and authority over cemeteries should be
exercised by a commission, etc., and, while the commission may exer-
cise all powers specially delegated, the residuum of powers remains
in the city council.

**Cemeteries—Grantee of Cemetery Lot Does not Take Fee Simple.**

2. A conveyance of a cemetery lot as a place of burial for the
dead does not vest the grantee with fee-simple title in the lot, but
gives rights analogous to an easement or a privilege; the right of
burial being a privilege or license to be enjoyed so long as the place
continues to be a burying ground subject to municipal regulation and
control and legally revocable whenever the public interest requires.

**Cemeteries—Conveyance of Burial Ground Passes License to Make
Interments so Long as the Place Remains a Cemetery.**

3. The conveyance of a plot of ground for burial purposes, though
not transferring an absolute right of property, passes a privilege
or license to make interments in the plot purchased exclusive of
others so long as the place remains a cemetery.

**Cemeteries—Conveyance of Burial Lot Includes More Than Mere Right
of Depositing Dead Bodies.**

4. The privilege or license created by the conveyance of a burial
lot, in the absence of express restriction, includes more than the mere
naked right of depositing dead bodies in the ground, for with the

---

2. For authorities discussing the question as to character of estate
or property of owner of burial lot, see notes in 67 L. R. A. 118;
L. R. A. 1918A, 147.

right is included the right to interment according to usual custom and the right of the living to express their affection and respect of the dead by decorating the place of interment.

#### Cemeteries—Purchaser and Successor are Entitled to Care for the Lot.

5. The purchaser of a burial lot and those who succeeded to his rights are entitled to exercise the right to care for the lot, and to exercise that right are entitled to reasonable access.

#### Cemeteries—Purchaser may Improve by Himself or Agent.

6. A purchaser of a cemetery lot may improve it, etc., either in person or by agent.

#### Cemeteries—Purchaser of Lot may Recover for or Restrain Desecration or Disturbance of Rights.

7. The right vested in the purchaser of cemetery lot is entitled to protection, and he may recover damages for any desecration or any unlawful disturbance of a grave and may invoke the aid of equity to restrain threatened wrongful acts.

#### Cemeteries—Rights of Burial Subject to Regulation Promulgated by Proprietor of Cemetery.

8. The right of burial is usually deemed to be subject to the reasonable rules and regulations promulgated by the proprietor of the cemetery.

#### Cemeteries—Rules of Proprietor must be Equal, Uniform and Reasonable.

9. All rules and regulations by the proprietor of a cemetery must be equal, uniform and reasonable.

#### Cemeteries—Regulation Requiring Lot Owner to Provide Fund for Permanent Maintenance Unreasonable.

10. Rule by cemetery commission under Astoria Charter, Section 51, requiring prior purchasers of lots to deposit a fund sufficient to care for their lots perpetually, which deprived the owners of lots of the right to care for the same and required them to be cared for under a park plan, is unreasonable and void, and the refusal of burial permits to compel compliance therewith may be enjoined; for the regulation is unreasonable and cannot be justified even under the police power.

#### Cemeteries—Proprietor not Entitled to Compel Lot Owner to Provide Fund for Permanent Maintenance.

11. Though a burial lot in a cemetery was conveyed subject to rules and regulations, the municipal proprietor cannot by virtue of such reserve power compel the purchaser to provide a permanent fund for caring for the lot.

#### Cemeteries — Purchaser cannot Exercise His Rights to Injury of Others.

12. The purchaser of a cemetery lot must not exercise his rights so as to injure others.

---

7. Rights of persons who have buried relations in cemeteries, see note in 75 Am. St. Rep. 427.

10. On validity of regulations concerning care or improvement of cemetery lots, see note in L. R. A. 1915E, 168.

Cemeteries—Proprietor is Entitled to General Control.

13.   Where burial lot was sold subject to rules and regulations, the municipality which was proprietor has general control over the grounds, and, if a purchaser of a burial lot by failing to act or acting wrongfully injures the rights of others, the city may resort to its right of general control to avail itself of the remedy.

Cemeteries—Offensive Inscriptions can be Prevented.

14.   Offensive inscriptions on a monument can be prevented.

Cemeteries—Improper Monuments cannot be Erected.

15.   A purchaser of a burial lot cannot erect improper monuments.

Cemeteries—If a Burial Lot is Unkept, the Proprietor may Remedy the Condition.

16.   If a burial lot becomes unsightly by reason of weeds, the proprietor of the cemetery can cause the condition to be changed.

Cemeteries—Proprietor can Compel Restoration or Removal of Ruinous Monuments.

17.   If any of the markers or monuments on a cemetery lot fall into a ruinous condition so as to disfigure the rest of the cemetery, the proprietor may cause them to be repaired or removed.

Cemeteries—Regulation Requiring Payment of Fund to Care for Cemetery Lot cannot be Sustained Because It Might Subsequently Become Overgrown.

18.   Where plaintiff's lot was not overgrown with weeds or brush, and in fact seemed too bare of growth; a regulation of the municipal cemetery commission requiring plaintiff to furnish a fund to perpetually care for the lot and keep it free from weeds and brush cannot be sustained on the theory that it might in the future become overgrown.

Cemeteries—Evidence Held not to Show That Cemetery Association had Cared for Plaintiff's Lot.

19.   In a suit by the owner of a cemetery lot to enjoin the cemetery association from enforcing against her its endowment plan for caring for the lots which had been adopted after she purchased her lot, evidence held not to sustain the association's contention that plaintiff's lot had been neglected so as to be a nuisance, and that the cemetery association had expended funds received for other purposes upon the care of that lot.

Cemeteries—Cannot Compel Lot Owner to Contribute to Endowment for Care Even if Lot is Neglected.

20.   A cemetery association cannot require owners of lots previously purchased to contribute to an endowment fund for the care of all the lots in the cemetery, even if the owner has neglected to care for her lot.

From Clatsop: JAMES A. EAKIN, Judge.

Department 1.

This suit was brought by Mrs. Thomas J. Mansker against the City of Astoria and the members of the

city's Cemetery Commission. The plaintiff prayed
for a decree invalidating a charge of $77.45 attempted
to be made by the Cemetery Commission against a
lot in the cemetery, which the plaintiff had previously
purchased from the city for burial purposes and for
which she paid the full purchase price. A trial re-
sulted in a decree for the plaintiff, and the defendants
appealed.

At some time prior to 1886, the City of Astoria in
the exercise of the power conferred upon it by the
legislature, bought a tract of land to be used as a
cemetery. The tract embraces about 80 acres and is
located about 12 miles west of Astoria. The distance
from the north to the south end is considerably longer
than it is from the east to the west side. The ceme-
tery was called Ocean View Cemetery, and it was
placed in charge of a committee appointed by the
mayor from the members of the council and known
as the committee on public property. From the date
of the opening of the cemetery until about 1904, all
interments were made in the south end only of the
cemetery. The climatic conditions prevailing near
the coast where the cemetery is located are such that
wherever the soil is fertile and free from shifting
sands, one may expect to find grasses, weeds, ferns,
shrubs and trees growing in profusion and with un-
usual rapidity. The soil in the south end of the
cemetery seems to be very fertile, for the evidence
shows that the conditions in the south end are such
that, if a plot of ground is neglected for even so much
as a year, ferns, salmonberry bushes, Scotch broom,
trees and weeds will sprout up and at the end of only
a few years the plot will be covered up by what some
of the witnesses have termed "a jungle." It appears
that when the cemetery was first opened interments

were made in the south end and continued to be made
in the south end exclusively until about 1904, when
the committee on public property discontinued issuing
permits for burials in the south end and required all
interments to be made near the center of the ceme-
tery.   Some of the plots were cared for by those
having relatives or friends buried in the south end,
but about half of the plots in which interments had
been made were neglected; and the result was that
the south end in appearance was much like a checker-
board, for scattered here and there were lots kept
neat and clean and between and around these lots
were an equal number covered with Scotch broom,
trees, weeds, vines and shrubs.   Because of this con-
dition prevailing at the south end of the cemetery the
committee on public property about 1904 caused an
area of approximately 10 acres to be cleared off near
the center of the cemetery, and thereafter no permits
were issued for burials in the south end, or "the old
part" as the south end was then called; and thence-
forth the interments were made in the "new part"
which had been cleared off near the center of the
cemetery.   All those who held lots in the "old part"
were permitted to exchange those lots for the same
sized lots in the new part.   Many and probably most
of the persons having lots in the old part took ad-
vantage of this opportunity to exchange; and in cases
where such exchanges were made, bodies buried in
the "old part" were exhumed and reburied in the
new part; so that in 1919, the date of the trial, only
between fifty and one hundred bodies remained buried
in the "old part."

Apparently the committee on public property was
not able, because of other duties, to give such time

and attention to the cemetery as its needs seemed to demand; and for that reason the charter was amended by the legal voters of Astoria in the exercise of the initiative on December 14, 1910. The amendment placed the management of the cemetery in the hands of the Cemetery Commission composed of five persons, appointed by the mayor; and since the adoption of the charter amendment the cemetery has been in charge of the Cemetery Commission.

Owners of lots in the "new part" did as the owners had done with their lots in the "old part"; about half of the lots received attention, but the remainder were neglected. Some of the lots which were cared for received slight attention while others were kept in good condition. Some of the lot owners employed the superintendent of the cemetery to care for their lots. A portion of the lot owners employing the superintendent to care for their lots paid for ordinary care while others paid for extra care; and, accordingly, some lots received only ordinary care while the others received extra care. The funds in the hands of the commission were derived from taxes and from the sale of lots. But the Cemetery Commission says that these funds can be and have been used only for general cemetery purposes such as caring for roads, avenues, pumping plant, salary of superintendent, and the unsold portion of the cemetery. The commission takes the position that none of the funds held by it can be lawfully used in caring for lots which have been conveyed by the city to private persons for burial purposes.

As a remedy for the unsatisfactory conditions then existing, the commission conceived a plan which the parties have referred to as the endowment plan. In

1917 the commission caused the superintendent of the cemetery to go over the grounds and make an estimate of how much it would cost each year to care for each of the lots in the cemetery, including both the sold and unsold lots. The services of a landscape gardener were enlisted, and he made a survey and estimate of the expense of keeping up the lots. The city engineer went over the grounds and made a report. The commission sought and received information from persons in charge of other cemeteries. Based upon these reports and this information the commission made its calculations. The course pursued in making the estimate for lot 1 in block 1 will illustrate the course pursued with all other lots. The estimated annual cost of keeping this lot in condition was, we shall assume, $3; and, therefore, figuring 5 per cent as the rate of interest, this being the rate used by the commission in its calculations, the principal sum of $60 was found to be necessary to produce an annual increment of $3. Inasmuch as no interest would be received the first year, an additional charge of $3 was made to cover the expense incurred the first year. In the case of this lot, as with all other lots, some expense would be incurred in leveling the surface of the lot; and this expense was estimated at $3. This was the method followed with all lots including the sold and unsold lots. Lot No. 1 was an unsold lot; and, therefore, to the foregoing items was added $20 as the price of the lot itself, making an aggregate of $86 as the sum paid by the person who afterwards acquired the lot. Of this sum of $86 so received by the commission, $60 was set aside as an irreducible and perpetual fund. No part of this irreducible fund except the interest arising out of it is available for keeping up the lot.

The commission did not in the beginning apply the endowment plan to any lots except those which were sold subsequently to the adoption of the plan. However, at the end of about a year, or on June 25, 1918, the commission adopted a resolution making the plan applicable to lots which had been sold prior to the adoption of the plan.

On January 5, 1912, the plaintiff purchased from the city a plot, 16x20 feet in area. She paid the purchase price of $16, received a conveyance, and immediately buried the body of her husband. The charge made against the Mansker lot under the resolution of June 25, 1918, was $77.45.

The resolution of June 25, 1918, declares that—

"Whereas, the commission deems it wise at this time, on account of having placed all lots hereafter sold in said cemetery on the endowment plan for perpetual care, that all moneys paid by owners of lots in said cemetery for the care thereof be paid to the clerk of the commission in endowment so that the same be properly accounted for in accordance with estimates recently prepared and adopted at meetings held August 14, 1917, and September 11, 1917, October 9, 1917, and that the superintendent in the future give his undivided time and attention to the cemetery work as provided in paragraph three, page four of the rules and regulations for the government of city cemeteries, therefore be it

"Resolved: That hereafter the superintendent of Ocean View Cemetery be and he is hereby required as provided under paragraph three, page four of the rules and regulations for the government of the city cemeteries to give his undivided time and attention to the cemetery work as provided under the rules and regulations for the government of the city cemeteries and under the direction of the commission; and that in the future he shall not receive or accept any money whatsoever from any person or persons owning lots

or plots in said cemetery, but shall refer all persons requesting his assistance in the decoration or improvement of any lot or parcel of land within the cemetery to the clerk of the Cemetery Commission, who will thereupon inform the applicant of the rules and regulations now in force in relation thereto and request that he pay the sum apportioned to such lot for the perpetual maintenance thereof as set forth in the schedule of costs as adopted by the Cemetery Commission at meetings held August 14, 1917, and September 11, 1917, October 9, 1917, and which is hereby made a part of this resolution."

The resolution further provided that the charges made against lots previously sold could be paid at once or in installments, but if paid in installments the whole sum "must be paid" on or before December 31, 1919—

"And failing to make said payment the commission will refuse permits for future interments in said lots, and the clerk shall not issue a permit unless at least one half of said sum has been paid and in accordance with the provisions of the deed under which the lots were sold; and the refusal, neglect or failure of owners to care for their lots properly shall annul all their rights therein and said lots shall revert to the city of Astoria for its sole use and benefit."

The resolution also contained the following provisions:

"The perpetual care and maintenance of all lots endowed as above described shall consist of keeping them sown in grass, which shall be kept watered and trimmed and all avenues surrounding them properly designated and free from obstructions. All monuments and markers shall be kept in proper positions, and no one shall be permitted to make any alterations or additions to the now existing monuments or markers, or surface of soil, without first obtaining permission therefor from the Cemetery Commission.

"The owner or agent of owner of any lot who may desire special and extra care be given his lot shall make application therefor in writing to the clerk of the Cemetery Commission and the said clerk shall submit the same to the Cemetery Commission who may make suitable arrangements therefor."

The plaintiff's father died; and on March 3, 1919, the plaintiff applied for a permit to bury his remains in her lot. With her application she tendered a fee of $5 required by the rules and regulations for opening and closing the grave. She had not paid any part of the charge of $77.45 made against her lot, and on that account the commission refused to issue to her a permit. She then brought this suit to enjoin the defendants from enforcing the resolution of June 25, 1918, and to restrain them from interfering with the interment of her father's remains in her lot. A preliminary injunction was granted upon her application and under its protection the body of the plaintiff's father was interred.

The answer questions the regularity of the conveyance received by the plaintiff, because of the fact that it was signed by the mayor and by the auditor of the city instead of by officers of the commission. However, at the hearing in this court we understood counsel for the defendants to say that the defendants waived any question about the regularity of the instrument in this respect; and hence we shall not give this feature of the paper any further notice, but shall assume that the instrument is as effective as it would have been if signed by the officers of the commission.

A proper understanding of the questions presented for decision cannot be acquired unless we first inform ourselves of such charter provisions as are material to the controversy. We must also acquaint ourselves

with the form of contract which, under a resolution passed on August 14, 1918, the commission adopted as the contract to be signed by the commission and persons who had purchased lots prior to the adoption of the endowment plan.

The territorial charter and the first state charter, in brief terms, empowered the city to purchase, receive and hold property beyond the corporate limits for burial purposes: Special Laws 1855–56, p. 4; Laws 1876, p. 117. Subsequently the charter provision relating to cemeteries was changed so as to read as follows:

"The council has power and authority within the city of Astoria— * *

"52. To provide cemeteries and to regulate the burial of the dead and shall have power to establish cemeteries or burial grounds within or without the city limits, and have authority and jurisdiction over the same, necessary to the safety, preservation, regulation and ornament of the same": Laws 1891, § 38, subd. 52, p. 291. See also Laws 1899, p. 761.

So far as we are advised, no change was made in this provision of the charter until December 14, 1910, when the legal voters of Astoria amended Section 38 of the charter, so far as it appertained to cemeteries; and as so amended the charter reads as follows:

"The council has power and authority within the City of Astoria: * *

"51. To provide cemeteries and to regulate the burial of the dead, and shall have power to establish cemeteries or burial grounds within or without the city limits and have authority and jurisdiction over the same necessary to safety, preservation, regulation and ornamentation of the same. The power and authority over said cemeteries or burial grounds shall be exercised by a commission to be known and desig-

nated as the Cemetery Commission, consisting of five members who shall be appointed by the mayor. * *

"Said Cemetery Commission shall have power and is hereby authorized and empowered to levy a tax of not exceeding one half (½) of a mill on each dollar of taxable property in the city of Astoria, at the time and in the manner as other taxes of the said city are levied. The funds derived from the levy and collection of the said tax shall be placed in the hands and control of the said Cemetery Commission, and shall be used exclusively for cemetery purposes and in maintaining, repairing, beautifying, equipping and ornamenting such cemeteries or burial grounds and for the building and maintenance of the proper pumping plants or other devices for the purpose of irrigating said cemeteries or burial grounds, and other needful or convenient appliances or devices for use in said cemeteries and for the care and preservation thereof.

" * * The treasurer shall be the custodian of all funds and shall pay the same out only upon warrants properly signed by the president or acting chairman and attested by the clerk.

"Said Cemetery Commission shall have authority through its president or acting chairman and clerk to sell all lots, blocks and plats in said cemeteries for burial purposes, and execute and deliver good and sufficient deeds of conveyance of the customary title thereof in the name of the City of Astoria; but before the president or acting chairman, and clerk shall be privileged to sell or otherwise dispose of any of such lots, blocks or plats, the commission shall carefully appraise and adopt and make known the value placed thereon; and it shall be the duty of the commission to make such appraisements as often as may be necessary from time to time. It shall also make and publish rules and regulations governing burials, structures permitted in said cemeteries, and on all proper matters, and shall also make and adopt by-laws for its own governance and procedure.

"Said commission shall make an annual report to the common council of all funds levied by it in taxation, and of all funds secured by taxes from the sale of lots and blocks or otherwise, the number of lots and blocks sold and of all expenditures and disbursements in detail herein.

"The city auditor and police judge, the city treasurer, the city attorney and the city engineer shall be the clerk, the treasurer, the attorney, and the engineer respectively for the commission, and they shall render such services as they may be called upon for, from time to time, without additional compensation other than their regular salaries as such city auditor and police judge, city treasurer, city attorney and city engineer."

The form of contract adopted by the commission was such as to obligate it, in consideration of the payment of the charge made against a given lot, "perpetually to care for and keep the same [the lot] under the park and lawn plan, now in general use by the cemetery associations."

The instrument by which the city conveyed lot No. 57 in block No. 47 to the plaintiff for burial purposes declares that the city does—

"Hereby grant, bargain, sell and convey to said grantee the perpetual use and occupancy, for the purpose hereinafter mentioned, of the following described parcel of land * * .

"To have and to hold the said use and occupancy of said premises and the privilege thereof unto the said grantee, and to his heirs, administrators, executors and assigns forever, for the sole purpose of a place of burial for the dead, which use and occupancy by the said grantee shall be at all times in strict conformity to the laws of the State of Oregon, and the ordinances, rules and regulations of the said grantor, now or hereafter existing, with reference to said cemetery, it being expressly understood, and this conveyance is executed and delivered with the express

reservation by the grantor, that if said premises shall at any time be used, or attempted to be used, by any person or persons whomsoever, for any other purpose than as herein set forth, the use, occupancy, rights and privileges granted herein shall immediately terminate.''

AFFIRMED.   REHEARING DENIED.

For appellants there was a brief over the names of *Mr. Edward E. Gray* and *Mr. Olôf Anderson,* City Attorney, with an oral argument by *Mr. Gray.*

For respondent there was a brief over the name of *Messrs. Norblad & Hesse,* with an oral argument by *Mr. A. W. Norblad.*

HARRIS, J.—1. The defendants have taken the position that all the power over cemeteries which, prior to the charter amendment of December 14, 1910, was vested in the common council, was by that amendment taken from the council and conferred upon the Cemetery Commission; and that, ·therefore, if the Cemetery Commission adopted a regulation concerning a particular subject ''the common council cannot enact a valid ordinance to the contrary.'' In other words, the defendants say that if the powers conferred upon the city are broad enough to support the adoption and enforcement of the endowment plan, then it must follow as a necessary conclusion that the acts of the Cemetery Commission are lawful and enforceable, on the theory that all power over cemeteries was conferred upon and is exercisable by the Cemetery Commission.

In our view the council is not divested of all authority over cemeteries owned by the city. The first sentence of subdivision 51 of Section 38 of the present charter is exactly the same as subdivision 52

of Section 38 of the charter of 1891, except that the word "the" previously appearing before the word "safety" is now omitted, and the word "ornament" previously used has been changed to the word "ornamentation." Under the charters of 1891 and 1899 all authority over cemeteries was conferred upon the common council. The same words which, in the charters of 1891 and 1899 were used to vest the common council with authority over cemeteries were used in the charter when it was amended on December 14, 1910; and the new matter constituting the amendment is merely an addition to the charter as it was before the amendment. It is impossible to say that the whole of municipal authority over the cemetery is vested in the Cemetery Commission, without ignoring and eliminating from the charter not only the words "the council has power and authority within the City of Astoria," but also the entire first sentence of subdivision 51 of Section 38. Obviously, the first sentence of subdivision 51 relates back to and must be connected with the words "the council has power and authority within the City of Astoria"; and when so connected the charter plainly says that the council has "authority and jurisdiction over" cemeteries, established by the city, "necessary to safety, preservation, regulation and ornamentation of the same." It is true that the amendment begins with the words: "The power and authority over city cemeteries or burial grounds shall be exercised by a commission"; but it is also true that the charter proceeds to detail and to particularize "the power and authority of the Cemetery Commission." The commission is empowered to levy a tax of not to exceed one half of a mill, to convey lots, to make rules and regulations,

and to do other specified things. The charter must, if possible, be so construed as to give effect to all the language found in it. If we adopt the construction suggested by the defendants, we can do so only by deleting a part of the charter. But we are not permitted to expunge an entire sentence of subdivision 51 of Section 38 of the charter; nor is it necessary to do so. The Cemetery Commission can exercise authority over the cemetery to the extent that the charter has particularized such authority. The commission is empowered to levy a tax; and the common council cannot deprive the commission of the power to levy such tax. The commission can adopt rules and regulations for the purposes specified in the charter; but the commission cannot, in the absence of authority conferred by the council or by the voters in the exercise of the initiative, exceed the authority which is particularized and specified by the charter. To the extent that the charter has particularized the powers of the commission it can act independently of the common council; but the residuum of authority is vested in the common council. We need not at this time discuss any of the questions which might arise out of a conflict, whether seeming or actual, between an ordinance enacted by the council and a rule or regulation adopted by the Cemetery Commission. At present we content ourselves by saying that the charter has not shorn the council of all jurisdiction and then conferred the whole of it upon the Cemetery Commission. We shall assume, and we may add that we think, that the Cemetery Commission is acting within its prescribed authority when it sells lots under the endowment plan. But quite a different question is presented when we come to consider the

authority of the commission to apply the endowment plan to lots which were sold before the endowment plan was adopted.

The concrete question for decision is: Can the commission by compulsion bring within the embrace of the endowment plan all lots which were sold prior to the adoption of the plan? In the discussion of this question we shall assume, without deciding, that if the municipality possesses power at all, it may be exercised by the commission, and we shall also assume, without deciding, that every resolution adopted by the commission concerning the endowment plan, is a rule or regulation. At the very outset we naturally ask: What did the conveyance pass to the plaintiff? What rights did she acquire? What rights remained in the city after the conveyance?

2. The conveyance received by the plaintiff did not vest her with the fee-simple estate in the lot, for by the terms of the instrument the lot was transferred to her as "a place of burial for the dead." The right or title acquired under a conveyance of a plot of ground for burial purposes is ofttimes likened to an easement; sometimes to the grant of a pew in a church and occasionally to both an easement and a license; but probably most frequently to a license or privilege. Although the right created by the conveyance of a lot for burial purposes is not one which, on the one hand, possesses all the inherent and essential qualities of an easement, and on the other hand, is subject to the limitations and qualifications which control and govern a pure easement, it does possess many of the characteristics of an easement; and it likewise possesses some of the qualities of a license, although it is unaccompanied by some of the charac-

teristics of a license and is unaffected by some of the qualifications and limitations which govern and control a pure license. And furthermore, when it is said that the right acquired by the purchaser of a burial lot bears an analogy to a pew tenancy, it must be remembered that the word "analogy" is used in its strict sense of denoting only, a partial similarity, for the likeness between the two rights is not perfect. Occasionally the suggestion is made that a conveyance for burial purposes creates an estate in the nature of a qualified or base fee. The right with which we are now dealing is in reality *sui generis,* for the reason that the places where the dead sleep are by all humankind treated as holy ground and by us are withdrawn from many of the rules which govern ordinary property; and, consequently, it is difficult to define or to describe such right when we use words which are usually employed in designating other rights possessing qualities in part similar and in part dissimilar to those inhering in the right of burial One of the descriptions or definitions of the right of burial is as follows: The right of burial is a privilege or license to be enjoyed so long as the place continues to be used as a burial ground, subject to municipal regulation and control, and legally revocable whenever the public interest requires: *Page* v. *Symonds,* 63 N. H. 17 (56 Am. Rep. 481); *Kerlin* v. *Ramage,* 200 Ala. 428 (76 South. 360, L. R. A. 1918A, 142); *Green* v. *Danahy,* 223 Mass. 1 (111 N. E. 675); *Anderson* v. *Acheson,* 132 Iowa, 744 (110 N. W. 335, 9 L. R. A. (N. S.) 217); *Kincaid's Appeal,* 66 Pa. 411 (5 Am. Rep. 377); *Clark* v. *Keating,* 183 App. Div. 212 (170 N. Y. Supp. 187); *Grinnan* v. *Fredericksburg Lodge,* 118 Va. 588 (88 S. E. 79, Ann. Cas. 1918D,

729).   See, also, *Roundtree* v. *Hutchinson,* 57 Wash.
414 (107 Pac. 345, 27 L. R. A. (N. S.) 875).   In
*Brown* v. *Hill,* 284 Ill. 286 (119 N. E. 977), it is
likened to an easement and is designated as a privi-
lege or license.   In some precedents it is referred to
as an easement or a license: *Nicholson* v. *Daffin,* 142
Ga. 729 (83 S. E. 658, L. R. A. 1915E, 168); *Stewart*
v. *Garrett,* 119 Ga. 386 (46 S. E. 427, 100 Am. St. Rep.
179, 64 L. R. A. 99); *Bessemer Land & Improvement
Co.* v. *Jenkins,* 111 Ala. 135 (18 South. 565, 56
Am. St. Rep. 26).   In the following adjudications the
right of burial is either characterized as an easement
or is said to be in the nature of an easement:
*Waldron's Petition,* 26 R. I. 84 (58 Atl. 453, 106 Am.
St. Rep. 688, 67 L. R. A. 118); *Augusta* v. *Breden-
burg,* 146 Ga. 459 (91 S. E. 486); *Trefry* v. *Younger,*
226 Mass. 5 (114 N. E. 1033); *Roanoke Cemetery Co.*
v. *Goodwin,* 101 Va. 605 (44 S. E. 769).   The follow-
ing are some of the cases which either affirm or deny
that the right of burial is analogous to a pew tenancy,
or affirm or deny that it is a qualified or base fee:
*Silverwood* v. *Latrobe,* 68 Md. 620, 629 (13 Atl. 161);
*Chew* v. *First Presbyterian Church* (D. C.), 237 Fed.
219, 237; *Pitcairn* v. *Homewood Cemetery,* 229 Pa.
St. 18, 20 (77 Atl. 1105); *Craig* v. *First Presbyterian
Church,* 88 Pa. St. 42, 54 (32 Am. Rep. 417).   See,
also, note in 67 L. R. A. 119.

3. Although the conveyance of a plot of ground for
burial purposes does not transfer an absolute right
of property, it does pass a privilege or license to
make interments in the plot purchased exclusively of
others, so long as the place remains a cemetery: 11
C. J. 60.

4. The privilege or license created by the convey-
ance, in the absence of express restrictions made at

the time, includes more than the mere naked right of depositing a dead body in the ground; for with the right of interment are included the right to do so according to the usual custom in the neighborhood, the right to make mounds and the right to erect stones and monuments at the graves: *Brown* v. *Hill*, 284 Ill. 286 (119 N. E. 977); 5 R. C. L. 247; 11 C. J. 62. A cemetery is not only a place where the living may bury their dead, but it is also a place where they may express their affection and respect for those dead by marking and decorating the place of interment: *Ex parte Adlof*, 86 Tex. Cr. Rep. 13 (215 S. W. 222).

5. The purchaser of a lot and those who succeed to his rights are entitled to continue to exercise the right to care for the lot, and in order to exercise that right are entitled to reasonable access to the lot.

6. The purchaser of the lot can improve it by placing material upon it or removing material from it, if reasonably necessary; and, although the precedents are not entirely in harmony, the better rule in our view is that the purchaser of a lot may exercise the right to improve it either in person or by an agent.

7. The right vested in a purchaser is one which like every other right is entitled to the protection of the law; and the purchaser or those succeeding to his interest may recover damages for any desecration or unlawful disturbance of a grave and may likewise when necessary invoke the restraining hand of equity, whether the wrongful act is done or threatened to be done by either a stranger or the proprietor of the cemetery: *Bessemer Land & Improvement Co.* v. *Jenkins*, 111 Ala. 135 (18 South. 565, 56 Am. St. Rep. 26); *Meagher* v. *Driscoll*, 99 Mass. 281 (96 Am. Dec.

759); *Kincaid's Appeal,* 66 Pa. St. 411 (5 Am. Rep. 377); *Anderson* v. *Acheson,* 132 Iowa, 744 (110 N. W. 335, 9 L. R. A. (N. S.) 217); *Trefry* v. *Younger,* 226 Mass. 5 (114 N. E. 1033); *Graves* v. *City of Bloomington,* 67 Ill. 493; *Pierce* v. *Swan Point Cemetery,* 10 R. I. 227 (14 Am. Rep. 667).

8. The right of burial is usually deemed to be subject to reasonable rules and regulations promulgated by the proprietor of the cemetery: 5 R. C. L. 245; *Nicholson* v. *Daffin,* 142 Ga. 729 (83 S. E. 658, L. R. A. 1915E, 168); *Roanoke Cemetery Co.* v. *Goodwin,* 101 Va. 605 (44 S. E. 769); *Rosehill Cemetery Co.* v. *Hopkinson,* 114 Ill. 209 (29 N. E. 685); *Johnson Cemetery Assn.* v. *Parker,* 28 Misc. Rep. 280 (59 N. Y. Supp. 821); affirmed in 45 App. Div. 55 (60 N. Y. Supp. 1015). Indeed, in the instant case the plaintiff agreed and consented that the privilege of burial together with all accompanying rights should be subject to the rules and regulations ''now or hereafter existing with reference'' to the cemetery: *State* v. *Scoville,* 78 Conn. 90 (61 Atl. 63); *Green* v. *Danahy,* 223 Mass. 1 (111 N. E. 675); *Hancock* v. *McAvoy,* 151 Pa. 460 (25 Atl. 47, 31 Am. St. Rep. 774, 18 L. R. A. 781).

9. In other words, the plaintiff agreed when she accepted the conveyance that the right of burial acquired by her should be subject to reasonable rules and regulations and that all accompanying rights such as the right to make monuments, the right to improve the lot, and the right to maintain it should likewise be subject to reasonable rules and regulations. The authorities agree that all rules and regulations adopted by the proprietor of the cemetery must be equal, uniform and reasonable: *Rosehill Cemetery Co.* v. *Hopkinson,* 114 Ill. 209 (29 N. E. 685). The au-

thorities do not always agree, however, that a given rule is reasonable. For example, the majority of the courts dealing with the question have ruled that a cemetery proprietor cannot by a rule, adopted after the sale of a lot for burial purposes, say to the purchaser that all improvements must be made by or under the supervision of the superintendent of the cemetery and that the purchaser cannot make the improvements in person or by his own agent: *Silverwood* v. *Latrobe,* 68 Md. 620 (13 Atl. 161); *Ex parte Adolf,* 86 Tex. Cr. Rep. 13 (215 S. W. 222); *Johnson Cemetery Assn.* v. *Parker,* 28 Misc. Rep. 280 (59 N. Y. Supp. 821; affirmed in 45 App. Div. 55 (60 N. Y. Supp. 1015). See, also, *Ritchey* v. *Canton,* 46 Ill. 185; *Benson* v. *Laurel Hill Cemetery Co.,* 68 Pa. Sup. Ct. 242; *Nicholson* v. *Daffin,* 142 Ga. 729 (83 S. E. 658, L. R. A. 1915E, 168). A different view is expressed in *Cedar Hill Cemetery Co.* v. *Lees,* 22 Pa. Sup. Ct. 405. See, also, *Augusta* v. *Bredenberg,* 146 Ga. 459 (91 S. E. 486).

10. When the plaintiff purchased her lot the city recognized her right to care for and maintain the lot, for at that very time, among the rules and regulations for the government of the cemetery were eleven rules "concerning the improvement and the keeping of the grounds"; and these eleven rules assumed that purchasers were entitled to do the work of improving and caring for their lots. The plaintiff, as the owner of the right of burial, is entitled to care for the lot where her dead are buried, and she may do so either in person or by her own agent. Nor can the city deprive her of this right without her consent. By the resolution of June 25, 1918, and the form of contract adopted by the Cemetery Commission, the city as the

cemetery proprietor, has in effect said to the plaintiff and to all others who purchased prior to the adoption of the endowment plan:

"You must agree that your lot shall be kept up under the park and lawn plan; you must agree that the work shall be done by the city and not by yourself, or by any other agent selected by you; you must agree that this work is to be done through all time; and you must agree perpetually to pay, for this work is never to be completed but is to go on forever; and if you do not so agree and if you do not furnish the fund which the city thinks is necessary to earn through all time enough money to pay the expense of caring for your lot, the commission will refuse to grant you a permit for future interments in your lot."

These limitations attempted to be placed upon the rights of the plaintiff amount almost to a deprivation of such rights; and consequently are unreasonable and unenforceable: 5 R. C. L. 246. See, also, *Monett Lodge* v. *Hartman*, 185 Mo. App. 148 (170 S. W. 670).

11. The circumstances are not such as to make the attempted action of the Cemetery Commission a lawful exercise of the police power, broad though the scope of the police power is. Nor can the city say that the right to compel the application of the endowment plan was reserved to the city at the time of the conveyance of the lot to the plaintiff. The city is without power to bring the plaintiff's lot within the embrace of the endowment plan, unless the plaintiff consents.

12–15. Undoubtedly the purchaser of a lot for burial purposes must exercise his rights so as not to injure others or interfere with the rights of others. Indeed, every right, whether it be in the perfect form of an absolute ownership of the soil, or in the uncertain form of an evanescent license, must be exercised subject to the restriction that it shall be so exercised

as not to injure others. The language of the conveyance received by the plaintiff contemplates that the city as the proprietor of the cemetery shall have general control of the cemetery grounds: *Hancock* v. *McAvoy*, 151 Pa 460 (25 Atl. 47, 31 Am. St. Rep. 774, 18 L. R. A. 781); *Roanoke Cemetery Co.* v. *Goodwin*, 101 Va. 605 (44 S. E. 769); and hence if a purchaser either by failing to act or by acting wrongfully injures the rights of others, the city can by resorting to its right of general control avail itself of a remedy. The available remedy, it is true, may not always be as effective as might be wished. Offensive inscriptions on monuments can be prevented: *McGann* v. *McGann*, 28 R. I. 130 (66 Atl. 52). A purchaser cannot erect improper monuments: *Pitcairn* v. *Homewood Cemetery*, 229 Pa. 18 (77 Atl. 1105). See, also, *McGough* v. *Lancaster Burial Board*, L. R. 21 Q. B. Div. 323 (57 L. J. Q. B. (N. S.) 568, 36 Week. Rep. 822, 52 J. P. 740).

16, 17. If a burial lot becomes so overgrown with weeds or otherwise unsightly as seriously to disfigure the burial ground, the cemetery proprietor can cause that condition to be changed; and if any of the monuments or markers become in such a ruinous condition as to disfigure the rest of the cemetery, the city has the power to cause them to be repaired and, if not repaired, to be removed: *Brown* v. *Hill*, 284 Ill. 286 (119 N. E. 977).

18. The complaint made against the condition of the plaintiff's lot is, not that it is overgrown with weeds and brush, but that it is likely to become overgrown at some time in the future unless it is cared for under the endowment plan. The record contains photographs of the plaintiff's lot and from these photographs it appears that if any criticism is properly to be passed upon the condition of the lot, it is

that the ground is too bare of growth rather than otherwise. It is true that the plaintiff has not planted and maintained flowers on the lot as many others would have done; but it is also true that thus far the plaintiff has neither done nor failed to do anything causing injury to the rights of others.

The carefully prepared briefs submitted by counsel for the respective litigants have covered the whole field of the controversy and have thrown all possible light upon every disputed point; and after viewing the different phases of the controversy, with the aid of the light shed by the briefs, we find ourselves unable to agree with the contention of the city, although we can well understand that from the viewpoint of many persons there are not a few strong practical reasons for desiring the application of the endowment plan to all lots in the cemetery. However, there are legal reasons preventing the compulsory application of the endowment plan to the plaintiff's lot; and therefore the decree is affirmed.

Affirmed.  Rehearing Denied.

Burnett, C. J., and McBride and Brown, JJ., concur.

Denied July 5, 1921.

Petition for Rehearing.

(199 Pac. 381.)

On petition for rehearing.                   Denied.

HARRIS, J.—The defendants have petitioned for a rehearing. In substance, the defendants urge that they tried their side of the case in the Circuit Court and also in this court—

"Upon the theory of an absolutely extreme and continuing nuisance," and that "a condition of extra-

ordinary and continuing nuisance existed, and for that matter exists to-day''; and that ''the nuisance was so extreme and of such a continuing nature as to threaten the very existence of the cemetery.''

In the original opinion we stated that it appears from a photograph received in evidence, that—

''If any criticism is properly to be passed upon the condition of the lot, it is that the ground is too bare of growth rather than otherwise.''

The defendants now declare in their petition for a rehearing that only a few weeks before the photograph was taken the Cemetery Commission caused the ground, including the Mansker lot, to be leveled; and hence the defendants say that ''the bare condition of the ground was merely a passing phase.'' In brief, the defendants argue that the evidence shows that a condition of actual nuisance existed and will exist in the future and that in this situation the Cemetery Commission is justified in applying the endowment plan. The defendants insist that they are entitled to a decision of this court based upon the asserted fact that a condition of nuisance has existed, now exists and will exist.

In the original opinion we explained our view of the nature and quality of the right acquired by the purchaser of a lot in a cemetery for burial purposes. We stated that although the conveyance of a plot of ground for burial purposes does not transfer an absolute right of property, it does pass a privilege or license to make interments, exclusively of others, in the plot purchased, so long as the place remains a cemetery. We also stated that in addition to the right of burial the purchaser acquires the right to improve the lot, erect and maintain monuments, and erect and maintain mounds; and we further stated that in our

view the better rule is that the owner of a burial lot is entitled to do the work of maintenance and improvement in person or by an agent selected by him and that he cannot be divested of such right without his consent.

The endowment plan, which the defendants are attempting to enforce upon the plaintiff, in effect says to every person who purchased previously to its adoption:

"You can no longer do the work of caring for your lot; but the Cemetery Commission will henceforth do it for you and you must pay the costs."

That such is the effect of the endowment plan is admitted by the parties themselves; for it was expressly stipulated by the litigants:

"That by the terms of the said endowment plan it is contemplated and provided that except in those special cases when special arrangements are made, the owners of private lots or plats shall not and may not take care of the same by their own efforts or expense, but that the Cemetery Commission shall have the sole authority and duty of thus perpetually caring for them, and paying therefor out of such endowment fund; it being contemplated and provided by the Cemetery Commission that the interest moneys secured from such fund annually would pay for the perpetual up-keep."

In the original opinion we stated that the proposed endowment plan in effect deprived the plaintiff and all others similarly situated of the right to do the work of improvement or maintenance themselves or by agents of their own selection. We also stated that the right of burial and the right of maintenance were subject to such reasonable rules and regulations as the cemetery proprietors might prescribe from time to time.

By the attempted application of the endowment plan the Cemetery Commission purposes to take from every purchaser of a burial lot the right of caring for the lot, regardless of whether the purchasers have previously maintained the lots in good or bad condition. The application of the endowment plan is not made to depend upon the bad condition of a given lot; but the object of the plan is to embrace all lots, both those which have been kept in good condition and also those which have been neglected. In our original opinion we in effect stated that it makes no difference whether the endowment plan be designated a rule or a regulation or whether it be called an exercise of the police power, for in either view the endowment plan is unreasonable and unenforceable because it extinguishes a right of which the purchasers cannot be deprived without their consent. The Cemetery Commission is undoubtedly authorized to prescribe and enforce reasonable rules and regulations, but it cannot under the guise of regulation perpetually deprive a lot owner of the right himself or by his agent to care for that lot. The Cemetery Commission has not said to lot owners:

"You must not permit your lots to become covered with noxious growths; for if you do we will remove them at your expense and until you pay that expense you cannot make additional interments."

On the contrary the Cemetery Commission has in effect said to lot owners:

"It makes no difference whether you wish to care for the lots one or a few years; you must make provision for perpetual care. It makes no difference whether you wish yourself or by an agent selected by you to care for your lot; you can no longer do so, for we the Cemetery Commission assume unto ourselves the exclusive right to care for the lot. If we

wish to grow daisies on the lot, you cannot plant roses. If we wish to keep the lot like a plain lawn, you will not be permitted to plant and grow flowers. The lot must be kept according to our tastes, and your ideas of beauty and ornamentation cannot be considered and will not be heeded. It makes no difference whether you have hitherto cared for your lot in a proper manner; for you as well as all others must accede to this rule which we the Cemetery Commission have applied to all lots indiscriminately.''

Even though it be assumed that the Cemetery Commission could legally apply the endowment plan to lots which have been neglected and permitted to be covered with noxious growths, it cannot be conceded that the Cemetery Commission can legally apply the endowment plan to lots which have been properly cared for. One lot owner cannot be deprived of a right merely because another lot owner has neglected his lot and thus rendered himself subject to a penalty. We repeat that in our view the proposed endowment plan in effect perpetually and irrevocably deprives lot owners, who purchased prior to the adoption of the plan, of a right which they acquired when they purchased their lots; and consequently as against such lot owners the endowment plan is unreasonable and unenforceable.

In the original opinion we proceeded a step further and stated in the next to the last paragraph of the opinion that—

''The complaint made against the condition of the plaintiff's lot is, not that it is overgrown with weeds and brush, but that it is likely to become overgrown at some time in the future unless it is cared for under the endowment plan. The record contains photographs of the plaintiff's lot and from these photographs it appears that if any criticism is properly to be passed upon the condition of the lot it is that the ground is too bare of growth rather than otherwise.

It is true that the plaintiff has not planted and maintained flowers on the lot as many others would have done; but it is also true that thus far the plaintiff has neither done nor failed to do anything causing injury to the rights of others."

Referring to this excerpt quoted from the original opinion the defendants state in their petition for a rehearing that—

"The photograph or photographs showing the leveled condition on the ground are true to this extent: That the Cemetery Commission, by wrongfully expending public funds, has thus leveled and improved the grounds, only a few weeks before those photographs were taken. That the fact is, as well understood by all of the parties at interest and the lower court, the Cemetery Commission in desperation had thus acted, in a preliminary effort to save the cemetery. * * These photographs show bare ground, with a few tufts of grass or weeds springing up almost immediately after the work was done. That there are no shifting sands or loose sands"; and that "a condition of extraordinary and continuing nuisance existed, and for that matter exists to-day. That the bare condition of the ground was merely a passing phase."

The paragraph of the original opinion to which the defendants refer stated the facts concerning the Mansker lot as we understood the facts from a careful examination of the transcript of testimony. We have re-examined the record with the result that we are unable to persuade ourselves that we have misunderstood the record.

The trial occurred on July 7, 1919. The photographs were taken on June 14, 1919. H. G. Van Dusen testified that he was the president of the Cemetery Commission, and that he had been a member of the commission ever since its organization. This witness was therefore in a position to know

whether moneys had been expended by the commission for work on private lots; and it is fair to assume that if the commission had caused any work to be done at any time upon the Mansker lot he would have so stated. After first explaining that moneys raised by taxes were used for general cemetery purposes, such as installing a water plant for the purpose of irrigating the cemetery, rocking roads, improving avenues in the cemetery and the like, Van Dusen was asked and answered questions as follows:

"Q. Did or did you not use any of that money for the purpose of improving private owned lots?

"A. No, sir.

"Q. * * I will ask you this, was any of this money used for the purpose of beautifying privately owned lots?

"A. No, sir."

Again we read in the record of Van Dusen's testimony:

"A. None of the improvements on the private graves has been done with the taxpayers' money.

"Q. So what you meant was that the taxpayers' money was used for cemetery purposes as a whole, avenues, expenses and roads?

"A. Yes, that is the taxpayers' money, that is that levy that we are permitted to use has been used for the improvement of the city's property but after a lot has been transferred from the city to a lot owner that then the lot owner is,—

"Q. Is supposed to take care of it?

"A. Has to pay for putting his lot in shape and for the care of it."

It is true that in their answer which was filed on January 14, 1919, the defendants allege that the plaintiff permitted her lot "to grow wild," that it became a nuisance and that the commission caused the lot—

"To be put in decent and safe condition, by destroying the weeds and other noxious growth thereon and
100 Or.—30

by planting grass seed and the like. That the expense of this work was paid out of funds secured by public taxation and were thus expended by the then Cemetery Commission without power or authority so to do, but apparently as a matter of necessity''; but it is also true that the quoted allegations were denied in most vigorous language by the plaintiff in her reply. The plaintiff does say affirmatively in her reply, however, that the defendants—

"Plowed over said lot as if it were a field for cultivation, knocked down the little wooden marker, * * and when plaintiff returned again to the cemetery said lot was a barren waste."

The plaintiff further says in her reply "that there is not enough grass on plaintiff's plot to cover the palm of a man's hand."

In brief, the defendants say in their answer, which was filed five months before the photographs were taken, that the commission removed the weeds and noxious growth and planted grass; but even though we assume for the purposes of the discussion that the Cemetery Commission did at some time remove weeds and plant grass on the Mansker lot there is not a word of evidence having the slightest tendency to show that the work was done after the end of 1916. And although the plaintiff says that the defendants plowed over the lot "as if it were a field for cultivation" there is not a word of evidence tending to sustain the allegation nor is there either allegation or evidence showing when it was done, if done at all. Although there is evidence, particularly the testimony of Van Dusen, that the improved part of the cemetery taken as a whole is likely to become overgrown with weeds and brush if neglected, we have been unable to discover any evidence showing that the Mansker lot has been covered with noxious growth or that at any

time since the plaintiff purchased the lot it has ever been in a condition other than that shown in the photographs. The Mansker lot may indeed be a sand lot. We do not undertake to say that it is or that it is not a lot covered with sand. We merely say that we do not know and cannot know from the record. The Mansker lot is a quarter of a mile from the "old part" of the cemetery where the noxious growth was so rank; and it must be remembered that a portion of the "new part" of the cemetery where the Mansker lot is located is, according to the uncontradicted testimony of Van Dusen, covered with sand.

After explaining that the first expenditure of funds made by the commission was for the installation of a pumping plant and water system, Van Dusen was asked and answered questions as follows:

"Q. And this was done then, Mr. Van Dusen, for the purpose of irrigating the cemetery?

"A. Yes, sir.

"Q. And state whether or not—whether it is a fact, Mr. Van Dusen, or not, when you took charge of the cemetery, was it or was it not at all nothing but sand or was there grass growing at that time on the improved portion we are speaking of?

"A. Well, there was some grass—that is dandelions and—

"Q. There was principally sand?

"A. Great portion of it was sand.

"Q. And what would happen during a storm, would the sand blow around?

"A. It blows out.

"Q. Would it cause depressions and mounds on graves where bodies had been interred—would it cause a depression of the soil after a storm or would it not?

"A. Yes, the storm would blow the sand out and drift it from one place to another.

"Q. Then, Mr. Van Dusen, the purpose of installing an irrigation plant there was to enable you to

sow grass seeds to hold the soil or sand together, was it not?

"A. Yes, sir.

"Q. State whether or not you had anyone down there to seed the seed, grass seeds, or what would be most effective to hold the sand together—did you have an expert down there or did you not?

"A. Yes, we did.

"Q. You paid him for his services?

"A. Yes, sir.

"Q. And he recommended or did he not recommend certain kinds of grass seeds as being most suited for the sand soil there?

"A. Yes, he did—we have that report.

"Q. And did you sow the seed?

"A. Yes.

"Q. You sowed seed out there?

"A. Oh, that is—all the grass that is there has been sowed.

"Q. But then you used the plan, constructed from the moneys secured from the one half of the one mill levied for the purpose of irrigating the improved portion to cause the grass to grow where sand used to be before, that is correct, is it not?

"A. Yes."

Speaking of the cemetery as a whole Van Dusen in substance stated that a portion of the "new part" would if neglected become "a jungle," and also that a portion of it was covered with sand which, unless kept in place with grass, would be shifted by the wind. No witness has undertaken to say whether the Mansker lot contains fertile soil or is covered with sand. The photographs rather indicate that the Mansker lot is largely composed of sand. We have been unable to discover a word of evidence in the record showing that the Cemetery Commission did any work of any kind at any time on the Mansker lot, except the evidence concerning the planting of grass. Indeed, Van Dusen's uncontradicted testimony is that

not a dollar of the commission's funds was used for the improvement of private lots. It is impossible to ascertain from the transcript of testimony the year or years in which the grass was planted. It does appear, however, that the grass was planted shortly after the Cemetery Commission was organized; and, although it is impossible definitely to know from the evidence whether the grass was planted before or after the sale of the Mansker lot, it is a fair inference to say that the work was certainly done before 1917.

The evidence fails to show that the plaintiff has ever done or omitted to do anything which has caused injury to the rights of others. There is no evidence showing that the Mansker lot has at any time been so covered with noxious growth as to be a nuisance; and at the most the evidence goes no further than to tend to show that the Mansker lot is likely to become overgrown at some time in the future if it is neglected. In a word, the endowment plan is unenforceable against a lot which was purchased before the adoption of the plan. The proposed plan in effect extinguishes a right of which the purchaser of a lot cannot be divested without his consent. Furthermore, even if the application of the endowment plan were conditioned upon the culpable neglect of the lot owner in permitting noxious growth, it cannot be applied to the Mansker lot because the evidence fails to show such culpable neglect.

The defendants seem to entertain the notion that our decision expressed in the original opinion was based solely upon the condition of the Mansker lot, and that our conclusion of law was based entirely upon the finding of fact which was to the effect that the record did not show that the plaintiff has ever

done or failed to do anything causing injury to the rights of others.

In the original opinion we intended squarely, positively and unequivocally to say that the endowment plan cannot be enforced because it is an unreasonable exercise of power. In the original opinion we stated:

"The concrete question for decision is: Can the commission by compulsion bring within the embrace of the endowment plan all lots which were sold prior to the adoption of the plan?"

The original opinion answers this question by saying:

"The city is without power to bring the plaintiff's lot within the embrace of the endowment plan, unless the plaintiff consents."

It was our view and we explained at length that the plaintiff was possessed of the right to care for her lot and that this right could not be taken from her without her consent. We pointed out that the endowment plan takes from the plaintiff and from other persons who purchased prior to the adoption of the endowment plan this right which the lot owners have to care for their lots. The endowment plan is conditioned upon nothing. The avowed purpose of the endowment plan is to give to the cemetery proprietor the exclusive right to care for burial lots. While it is conceded that the cemetery proprietor can prescribe and enforce reasonable rules and regulations, the Cemetery Commission cannot deprive lot owners, without their consent, of the right themselves to care for their lots. We repeat that the endowment plan operates to extinguish a right which the plaintiff acquired when she purchased her lot, and it makes no difference whether the endowment plan be called a rule or a regulation or an exercise of the police

power, because in any event it is an unreasonable exercise of power and is unenforceable. Our conclusion that the endowment plan is unreasonable and therefore unenforceable was, it is true, sufficient to dispose of this appeal; but we proceeded further and stated that the record did not show that the plaintiff had permitted her lot to become in such a condition as to injure others.

We now repeat that a critical re-examination of the record fails to show that the plaintiff's lot has ever been in such a condition as to injure the rights of others. It may be conceded that some of the persons participating in the trial had personal knowledge that the Cemetery Commission did in truth care for the Mansker lot and that the plaintiff gave it no care at all; but we are not permitted to take notice of any facts unless they are appropriately made a part of and recited in the record, for we are confined to the record as it is presented to us; and according to the uncontradicted testimony of Van Dusen:

"None of the improvements on the private graves has been done with the taxpayers' money."

The endowment plan as already explained is conditioned upon nothing. The plan does not provide that it shall become operative only in case a lot owner fails properly to care for his lot; nor is it based upon any other condition. Although the endowment plan would not be legal and enforceable even though it were conditioned upon the failure of a lot owner to care for his lot, yet assuming for the purposes of this discussion that the plan did contain such a condition and that it would be legal if based upon such a condition, nevertheless it could not, upon the record presented to us, be made applicable to the Mansker lot for the reason, we reiterate, that the recorded evidence does not show that the Mansker lot has ever

been in such a condition as to harm the cemetery taken as a whole or as to injure the rights of any individual.

The petition for a rehearing is denied.

REHEARING DENIED.

BURNETT, C. J., and McBRIDE and BROWN, JJ., concur.