No. 28,931.

Mrs. Howard Dunlap, Mrs. G. W. Newman, Mrs. Bertha Newman Sprague, A. B. Widick, Nellie A. Harris, Alicia B. Richards, Mable J. Forde, Thomas H. Roberts, E. M. Forde and H. P. Hood, *Appellees,* v. Union Lodge, No. 15, I. O. O. F.; Clyde S. Carle, Noble Grand; J. O. Cowan, as Secretary; Charles H. Tweedy, C. A. Reeble and F. C. Moore, as Trustees; The Memorial Lawn Cemeteries Association, Fred C. Coe or Ira C. Coe, as President; and The Lyon County State Bank, *Appellants.*

(282 Pac. 715.)

Opinion filed December 7, 1929.

W. L. Huggins, W. W. Parker, both of Emporia, and Ralph Glenn, of Topeka, for the appellants.

W. C. Harris, O. S. Samuel and W. L. Harris, all of Emporia, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to enjoin the sale and transfer of cemetery property belonging to an Odd Fellows lodge. The purchaser was a corporation chartered to conduct that sort of business.

Plaintiffs are the owners of burial lots in Maplewood cemetery, situated near the city of Emporia. The defendant, Union lodge, No. 15, of the Independent Order of Odd Fellows, is the local Odd Fellows lodge in Emporia. It owns the cemetery, having acquired the original 10⅛ acres of its present extent three quarters of a century ago. The lodge has conducted the cemetery very much like a public cemetery. It has sold burial lots to all who chose to buy, and from time to time it has purchased additions to the original acreage

until it now consists of 67½ acres and is one of the principal cemeteries of Lyon county.

The defendant, the Memorial Lawn Cemeteries Association, is a Kansas corporation chartered "to build and operate cemeteries" and "to do any and all things necessary incidental to such business."

Plaintiffs object to the sale of Maplewood cemetery for various reasons alleged—its violation of plaintiffs' rights, violation of the lodge's duty as trustee of a fund for the care of plaintiffs' burial lots, disregard of statutory regulations governing cemeteries, want of power on the part of the lodge to dispose of the cemetery, and other objections which may be noticed as we proceed.

The contract between the Odd Fellows lodge and the Memorial Lawn Cemeteries Association, the validity of which is in question in this lawsuit, provided that the purchaser should undertake all the obligations of the lodge in relation thereto. The avowed purpose of the lodge in negotiating the sale of the cemetery was to relieve itself of a function it was no longer practicable for it to perform. Its answer alleges that defendant, Union lodge, No. 15, of the Independent Order of Odd Fellows—

"Ever since its organization in 1865 has been and is now a fraternal and benevolent society; that its ownership and management of said Maplewood cemetery has been in line with its purposes and work as such society; that it has never been the intention that any profit should arise to it by the management of said cemetery; that the officers of the said lodge having charge of said cemetery have worked for mere nominal pay, or without any pay at all; . . . that in recent years the managerial burden of carrying on said cemetery has become too great for this defendant; that it is impossible for this defendant, Union lodge, No. 15, I. O. O. F., under its present organization, to carry on and conduct the business of said cemetery as it ought to be done, to meet the needs and requirements of the city of Emporia, and the people thereof, for a modern cemetery, with receiving vault, chapel, and landscaping, such as the public now demands in a cemetery; that its object in seeking to transfer said property is that it may relieve itself of the burden of carrying on such large operations outside of its fraternal and benevolent work; further that said cemetery may be turned over to some organization qualified and competent to manage and control it and carry on the work as it should be done."

The pleadings chiefly raised questions of law. The evidence developed no sharp dispute over pertinent facts. The record presents an interesting narrative of the origin of the cemetery by the acquisition of the first 10⅛ acres of land in 1860 by certain trustees

of Emporia lodge of Odd Fellows, No. 10, "for the use and behoof of Emporia lodge, No. 10, I. O. O. F., forever." From that time the property has been continuously used as a burying ground. Emporia lodge, No. 10, I. O. O. F., ceased to function during the civil war. Its effects were taken over by the grand lodge of that fraternity. When the civil war ended some of the members of the earlier lodge organized Union lodge, No. 15, which eventually was recognized by the grand lodge and the property of the defunct Emporia lodge, No. 10, came into its hands. It is needless to scrutinize how the fee title of the original acreage of this cemetery became vested in Union lodge, No. 15. Having had unchallenged dominion over the property for over half a century its title is, of course, unassailable. (R. S. 60-304.) In 1877 Union lodge, No. 15, was formally incorporated under a state charter empowering it to exercise the characteristic powers of a fraternal organization of its peculiar craft and mystery.

It is not shown just how long ago the practice of executing deeds to burial lots in the cemetery was begun, but apparently it has been in vogue for forty years or more. Typical of those early deeds was one from Union lodge, No. 15, to Howard Dunlap, his heirs and assigns forever, conveying "lot 133, block 2, in Maplewood cemetery, according to the recorded plat thereof." The consideration was $65, and the deed contained the following:

"This deed is made and accepted upon the express condition that *the grantee* and those claiming under him shall keep the conveyed premises in good order clean and tidy, well graded, and free from weeds, and failing therein, said first party may so improve, cultivate, and clean said lot, at the expense of the grantee one dollar per year being agreed upon, which shall be and remain a first lien upon said lot, and if any part thereof remains unpaid for five years, the title hereby conveyed shall revert to said party of the first part. It is hereby stipulated that the decision of said trustees shall be conclusive as to the question of proper and sufficient care."

In later deeds executed to some of these plaintiffs there was a different condition from that just quoted—one which bound the grantor to care for the lots thus conveyed. Typical of these was one to Owen Samuel, which acknowledged a consideration of $55 and contained the following:

"This deed is made and accepted upon the express condition that *the party of the first part, and those claiming under it, shall keep the conveyed premises in good order*, clean and tidy, well graded, and free from weeds and will so improve, cultivate and clean said lot or lots at no expense to party of the second part, it being agreed by both parties hereto, that said party of the second part shall pay said first party the sum of Twenty-five and no/100

dollars ($25), the receipt whereof is hereby acknowledged, for which said first party agrees to care for said above-described premises, as aforesaid, perpetually, without further expense and compensation from said second party."

A witness for the plaintiffs, W. C. Harris, who had married a daughter of the late Mary E. Roberts, an early title holder to two of the burial lots, testified that "before the perpetual upkeep fund was required in Maplewood cemetery," and before any provision had been made for the perpetual upkeep of lots, he had paid $20 or $30 to the defendant lodge as an upkeep fund for the two lots which stood in the name of his mother-in-law. Other instances of substantial sums of money received by the lodge "or whoever was in charge of the cemetery" were shown in evidence; and it was admitted that the defendant lodge had accumulated a fund of about $8,000 for the perpetual care of burial lots which the lodge had sold to plaintiffs and others. It was also admitted that the defendant lodge had acquired and platted additional lands for cemetery purposes. The lodge also owns a tract as a gravel pit for road making in the cemetery and another tract occupied by the house and grounds of the caretaker and his family. There are many burial lots yet unsold in all the platted portions of the property. The cemetery is the one most accessible to the city of Emporia, and popular subscriptions have been raised and expended for the graveling of a public road leading from the city limits to the cemetery. The lodge itself has contributed to this road improvement and has furnished gravel from its pit for that purpose. A matter of earnest inquiry in the trial court was whether any portion of the moneys received by the defendant lodge from the sale of burial lots and as contributions to the perpetual upkeep fund had been used to purchase any part of the later additions to the cemetery acreage. The secretary of the lodge and custodian of its records testified that all the income of the lodge from whatever source went into a general fund. He was not sure whether some of the money derived from the sale of burial lots went into the purchase of additional acreage or not. Counsel for the defendant lodge stated:

"It may be considered as an admission on the part of Union lodge, No. 15, I. O. O. F., . . . that some years there has been a greater sale of lots—think it is possible that prior to 1900 or 1902 or 1903 in there—there might have been a time when they purchased additional land when there was some money in the treasury from the sale of lots; that they had been paying out for employees and bills in the upkeep of the cemetery—that theretofore some money derived from the sale of lots may have gone into some of this additional real estate."

The contract for the sale of the cemetery by the defendant lodge to the defendant cemetery association provided for the conveyance of all the interest of the lodge in the cemetery property, real and personal, including the lodge records, supplies, materials and equipment pertaining thereto, and including the perpetual upkeep fund, specified to be $8,000. The cemetery association bound itself to assume and perform all the obligations devolving on the defendant Odd Fellows lodge by virtue of its long-continued ownership and management of the cemetery. The stipulated consideration for the cemetery property was $12,000.

The trial court gave judgment in favor of plaintiffs, enjoined the sale of the cemetery, and forbade defendants to put any part of their contract of sale into effect. Defendants appeal.

The substance of defendants' specification of errors is a challenge of the correctness of the judgment. To determine its propriety it may make for clarity to consider the argument of counsel for plaintiffs who seek to uphold it. By this method of approach this court will have the benefit of the informal opinion of the trial court, submitted by appellees for our perusal.

Plaintiffs' case is largely bottomed on the assumption that Union lodge, No. 15, of the Independent Order of Odd Fellows is a cemetery corporation governed by some one or more of the half dozen statutes which have been enacted from time to time concerning corporations of that character. This argument is not pursued with consistency throughout appellees' brief; where it falters in that regard the inference seems to be that the lodge is some sort of dual corporation—having corporate functions pertaining to its benevolent and fraternal activities, and other corporate functions pertaining to its proprietorship of Maplewood cemetery.

The soundness of such a view depends upon how nearly it articulates with the fundamentals of corporation law, the simplest and most positive of which is that corporations are purely creatures of statute; they exist only by virtue of a grant of corporate power in conformity with legislative enactments for some one of the many purposes enumerated in the statute. (R. S. 17-201 *et seq.*) A single corporation does not receive dual grants of corporate power except in a few expressly enumerated instances found in the statute itself. (R. S. 17-202.) Even the incidental powers which every corporation enjoys by virtue of its principal grant of power are themselves explicitly conferred by statute. (R. S. 17-601.) To illustrate: a

banking corporation having an express grant of corporate power has incidental powers to take title to a farm, a steam laundry, or a sawmill, and to operate it for a reasonable length of time, if the acquisition and temporary management of either of these be advisable to protect the bank against loss. But the law does not contemplate that a single corporation may be formed to operate a bank and a steam laundry, to operate a hotel and a sawmill, to conduct a private hospital and a coal mine, nor to maintain a library and to improve the breed of domestic animals. Not to labor this point unduly, the law contemplates that if persons desire to conduct these divergent enterprises under corporate management, a separate corporation should be formed for each of them.

The defendant, Union lodge, No. 15, was organized as a fraternal body according to the tenets, rules and usages of that respectable society. Its corporate charter explicitly so recites. It never applied for and never received a charter to conduct the business of a cemetery corporation. Whatever it has done in that respect had its inception in pioneer times when a group of public-spirited persons, banded together for fraternal and kindred purposes, determined to supply a public need for the people of its community—a cemetery. In three quarters of a century that undertaking has grown to be the very considerable business activities which pertain to the proprietorship and management of the Maplewood cemetery as they exist today. When the Odd Fellows lodge began this public-spirited enterprise it could not foresee that its cemetery responsibilities would expand until they completely overshadow in importance the social and fraternal purposes for which the Independent Order of Odd Fellows is organized. It cannot be judicially declared that when the original lodge of Odd Fellows in Emporia, and Union lodge, No. 15, as its successor, undertook to supply that pioneer community in Lyon county with a burial ground that it bound itself for all time to carry on that project. And when Union lodge, No. 15, comes into court and states its reasons for selling Maplewood cemetery to a corporation chartered and equipped to carry on that sort of business—that the managerial burden of the cemetery has become too onerous and that the lodge finds it impossible to continue the service it has so long rendered to the community—such a statement does not tender an issue which may be traversed by plaintiffs. What the lodge has deliberately determined to do is a matter over which that body is finally and exclusively the arbiter, and one with

which the courts have nothing to do. Certainly no court has the power to command the Odd Fellows lodge to continue to carry on the business of managing Maplewood cemetery when that body has decided to be rid of it.

Counsel for the plaintiffs have culled through the statutes, citing first one and then another of their provisions which pertain to cemetery corporations. None of those cited has anything to do with Maplewood cemetery so long as Union lodge, No. 15, continues to be its proprietor. Union lodge, No. 15, is not an incorporated cemetery association, so statutory provisions making lot owners in a cemetery corporation members or shareholders of the corporation itself and thereby empowered to participate in the corporate management have nothing to do with this case. Neither have the statutory provisions for the building up and preservation of a permanent maintenance fund anything to do with Maplewood cemetery; and the fact that Union lodge, No. 15, has striven after a fashion to keep pace with modern ideas of incorporated cemetery associations by creating such a fund does not change its actual status as an Odd Fellows lodge into a cemetery corporation. The fund for the upkeep of the burial lots which the lodge has sold is not in any correct legal sense a trust fund. To create a trust fund there must be a contract between one party as trustor or creator of the trust and another party as trustee concerning the subject matter of the trust and the trustee's duty thereto towards the beneficiaries. Here the lodge contracted with nobody. It merely and voluntarily set about the building up of a maintenance fund such as the statute requires of a cemetery corporation organized after 1914 which has a capital stock and operates a cemetery within two miles of any of the cities of this state. (This act originally applied only to corporations owning cemeteries adjacent to cities of over 45,000 population.) Such cemetery corporations are required to create a permanent maintenance fund to be kept by the treasurer of such cemetery corporation, and a surety bond must be given by him to insure its preservation. (R. S. 17-1311, 17-1312.) Union lodge, No. 15, is not constituted so as to function under that statute, and the fact that it has made a good-faith effort to pattern its financial structure after this modern idea does not bind it to go on doing so indefinitely.

Touching the sale of the upkeep fund, that is merely a part of the assets which the lodge has been pleased to accumulate and set apart

as appertaining to its cemetery business. It is no concern of anybody but the lodge and its members whether that fund is $8,000 or more or less. No one except the lodge itself, and perhaps its superior, the grand lodge of the order, has anything to do with it. (*Reno Lodge v. Grand Lodge,* 54 Kan. 73, 37 Pac. 1003.) If the lodge owed a debt which it refused to pay, or if its cemetery business had reduced it to bankruptcy, then indeed there might be a judicial overhauling of its accounts, records, funds and the like. No such situation is presented here.

We note some faultfinding with the corporate structure of the defendant, the Memorial Lawn Cemeteries Association, but that is no concern of these plaintiffs. It is duly chartered under state law, and its corporate integrity is not subject to challenge in this lawsuit. Some deductions by the trial court and counsel for plaintiff are drawn from the fact that no taxes are paid or required from either of these defendants on account of their cemetery properties. In our view that fact lacks significance. Our statutes make repeated declarations that burial lots and cemetery properties are exempt from taxation. Suppose all such exemptions are invalid and that graveyards are amenable to taxation. How would taxes on burial grounds be collected? By sale by the county treasurer as in the case of ordinary default of payment of taxes on real estate? Who would buy and what would he do with his purchase—build a house in the cemetery, establish a factory there, or a dancing pavilion? We read in cyclopedias and books of travel that in some foreign countries if the tax or rent is not paid on a burial lot or crypt the bones of the dead are taken out and flung over the back fence. (5 Ency. Britt., 14th ed., 112.) Fortunately in this enlightened commonwealth we are not so hard put for public revenues that such draconic methods of tax gathering have to be practiced. (*Gray v. Craig,* 103 Kan. 100, 172 Pac. 1004.)

Many other arguments to support the judgment are·urged upon our attention. They have all been considered; they are not convincing. The decisions of this court cited by plaintiffs all have to do with the rights of parties in cemetery properties held by cemetery corporations. In the contract of sale between Union lodge, No. 15, and the Memorial Lawn Cemeteries Association the lodge's purpose is to hand over Maplewood cemetery and its related assets to a corporation empowered and equipped to carry on the work as it should be done. The purchaser is a cemetery corporation whose

functions are regulated by law. The perpetual upkeep fund which has been the subject of so much solicitude on the part of plaintiffs will be actually and expressly governed by statute once it passes into the hands of the purchasing corporation—a status it does not now have. Counsel for plaintiffs sum up their objections to the contract by saying, "We cannot conceive of a court of equity placing its approval of such a transaction." Counsel mistake the important point in this lawsuit. The courts have no function to approve this transaction. It is not a judicial sale. The legal question is whether good grounds for a court of equity to interfere with the transaction are shown. On that point this court feels constrained to give a negative answer.

The judgment of the district court is reversed and the cause remanded with instructions to set aside its injunction and to enter judgment for defendants.