Argued February 16, reversed July 26, 1961

# EUGENE PIONEER CEMETERY ASSOCIATION
## *v.* SPENCER BUTTE LODGE NO. 9
### (I.O.O.F.) ET AL
#### 363 P. 2d 1083

*John L. Luvaas,* Eugene, argued the cause for appellants. On the brief were Luvaas, Cobb & Richards and Husband & Johnson, Eugene.

*Mark V. Weatherford,* Albany, argued the cause for respondent. With him on the brief was Harrison M. Weatherford, Albany.

Before McALLISTER, Chief Justice, and WARNER, SLOAN, GOODWIN and LUSK, Justices.

LUSK, J.

This suit was brought by The Eugene Pioneer Cemetery Association to obtain a decree (1) setting aside a deed of conveyance of a cemetery property usually referred to as the Odd Fellows Cemetery in

Eugene, Lane County, Oregon, in which deed The Trustees of Spencer Butte Lodge No. 9, Independent Order of Odd Fellows, a corporation, were the grantors, and the defendant Pioneer Memorial Park Association, a corporation, the grantee; (2) ordering The Trustees of said Lodge to execute a deed conveying such property to the plaintiff; and (3) enjoining the defendants from interfering with the management and control of the cemetery.

From a decree for the plaintiff in accordance with the prayer of the amended complaint, the defendants have appealed.

The plaintiff will hereinafter be referred to occasionally as "Plaintiff Association". Spencer Butte Lodge No. 9 will be referred to as "The Lodge" and The Trustees of The Lodge as "The Trustees". Because, as will hereinafter appear, there was an earlier corporation of the same name, the defendant Pioneer Memorial Park Association will be referred to as "Defendant Association".

The cemetery was established in the year 1873 with title to the land in the name of The Trustees.[1] It adjoins the campus of the University of Oregon. In 1930 owners of lots in the cemetery and others organized Odd Fellow Cemetery Association of Eugene, Oregon, pursuant to Oregon Laws 1920, Title 39, ch 11, §§ 7033-7044. The name of this association was afterwards changed to The Eugene Pioneer Cemetery Association, the plaintiff here. The object of the association, as stated in its articles, was to take over, manage, and control and perpetually care for and

---

[1] From the title of the case it would appear that The Lodge and The Trustees were separate organizations. In fact, as the record discloses, the only organization was Spencer Butte Lodge No. 9 (I.O.O.F.), a fraternal society and an Oregon corporation, and The Trustees were the governing body or directors of the corporation.

beautify the Odd Fellows Cemetery in Eugene. The occasion for its organization appears to have been that all the platted lots in the cemetery had theretofore been sold; The Lodge had purchased a new cemetery site and ceased to maintain the old cemetery, which had fallen into a state of neglect and disrepair. Aside from donations, which were inadequate, there was no source of funds to devote to its care. What care it had was given by lot owners and other persons whose ancestors and relatives were buried there.

One of the organizers of Odd Fellow Cemetery Association was M. Svarverud. At about the time of its organization, he and other persons filed a petition with the county court of Lane county pursuant to Oregon Laws 1927, ch 237, now ORS 97.360-97.430, for the vacation of certain alleys, streets and public grounds in the cemetery. An order granting this petition signed May 17, 1930, purported to vest title to the vacated lands in Odd Fellow Cemetery Association and as a result 1,600 additional burial lots were made available from the sale of which it was anticipated that a fund for perpetual care of the cemetery would be derived. These hopes met with disappointment. Not more than 45 lots were sold and the cemetery continued to be neglected, notwithstanding the individual efforts of interested persons and organizations to care for it.

This "depressing situation", as it is characterized in a report in evidence, led to the formation in 1954 of a new corporation known as Pioneer Memorial Park Association and referred to in the record as Pioneer Memorial Park Association (No. 1) to distinguish it from the Defendant Association bearing the same name and which was later organized. Pioneer Memorial Park Association (No. 1) was a nonprofit corporation organized under ORS, Title 7, ch 61. The

incorporators were Arnold Lindeland, R. W. Leighton, Cora L. Kreamer, Charles P. Poole, Wendell S. Bartholomew, Nina N. McCornack, and Harold V. Johnson, Jr. All these except McCornack and Johnson were trustees of Odd Fellow Cemetery Association, having been elected at the annual meeting of that association held March 2, 1954. Mr. Poole became chairman of the board of the new corporation and also sexton of the cemetery.

The articles of incorporation of Pioneer Memorial Park Association (No. 1) were executed on June 9, 1954. They recite in some detail the history of the cemetery thus far summarized and state that the object of the corporation was to receive from The Lodge and Odd Fellow Cemetery Association and to use for cemetery purposes land heretofore used for such purposes and generally to operate a cemetery.

In December, 1953, The Lodge executed a bargain and sale deed to Pioneer Memorial Park Association (No. 1) of all its right, title, and interest in the cemetery property, which deed was delivered after that association was organized, and under date of September 24, 1954, Odd Fellow Cemetery Association executed a similar deed to the same grantee, thus vesting in Pioneer Memorial Park Association (No. 1) full title to the cemetery property.

Under date of January 10, 1956, Pioneer Memorial Park Association (No. 1) executed a bargain and sale deed reconveying all its right, title, and interest in and to the cemetery property to The Lodge, and on January 14, 1956, this association adopted a resolution of dissolution. The resolution recites, inter alia, that the trustees of the association had found after investigation that contemplated methods of raising funds to maintain and administer the cemetery could

not be successfully employed and that there was need to reorganize the cemetery and reduce it in size, using the proceeds of the sale of a portion of the land to provide a perpetual care endowment fund, though even this plan, it was said, would not be adequate for all the purposes envisaged by the board. The resolution continued:

"WHEREAS, it was later found that the State Board of Higher Education would consider entering into a contract with the Pioneer Memorial Park Association by the terms of which contract, if mutual agreement could be reached, the State Board of Higher Education would provide finances for or perform the reorganization of the cemetery indicated above, and attain all of the purposes and plans origionally [sic] stated herein as the plans and purposes of this corporation, providing, the total cemetery could be made a part of the University of Oregon campus and the portions of the cemetery freed of burials by reorganization be made available for unrestricted use as part of the University campus, and

"WHEREAS, the corporation in the process of developing plans met with organized opposition to any plan for reorganizing the cemetery, if in that reorganization, bodies now interred in the cemetery would have to be moved from the present place of interment in the cemetery to another place of interment in the same cemetery, and

"WHEREAS, this opposition came to involve such bitter animosities that it was evident that a considerable ill will and bad feeling would persist in the community for a considerable time and

"WHEREAS, the corporation has decided that having exhausted all possibilities of carrying out its original plans, and found only one plan by which its purposes and functions can be carried out, and further finds that this plan engenders the opposition and ill will described above, therefore be it

"*  *  *  *  *"

Following these events, in the summer of 1956, there was a meeting between The Trustees and representatives of Odd Fellow Cemetery Association in which, according to plaintiff's claim, it was agreed orally that title to the cemetery property and the right to control and operate it would be vested in Odd Fellow Cemetery Association. The precise terms of the agreement as alleged in the pleadings and the evidence regarding it will be detailed later. It will be sufficient now to state the following facts: Under date of January 5, 1957, The Trustees (at that time H. L. Hilliard, Charles P. Poole, and Frank I. Peterson) signed a bargain and sale deed to the property with the name of the grantee left blank. On December 10, 1957, William E. Walsh, Charles R. Holloway, Jr., H. L. Edmunds, Ralph W. Leighton, Charles P. Poole, Sidney W. Claypoole, and D. T. Bayly, executed articles of incorporation of "Pioneer Memorial Park Association" (the Defendant Association), a nonprofit corporation, organized pursuant to ORS, Title 7, ch 61. See especially ORS 61.755-61.775. Thereafter, the name of this corporation was inserted in the deed executed January 5, 1957, and the deed delivered to it for a consideration of $500. The sale was reported to a meeting of The Lodge held December 24, 1957, and ratified. It is this deed which the plaintiff seeks to have set aside.

The court entered findings of fact and conclusions of law which substantially followed the allegations of the amended complaint and the reply.

The court found the following facts:

Cemetery lot holders and descendants thereof in 1930 organized Odd Fellow Cemetery Association to own and administer the cemetery. Odd Fellow Cemetery Association acquired title to the vacated portions

of the cemetery by virtue of the proceedings in the county court of Lane county in 1930 and thereafter continuously operated the cemetery and sold lots therein. Prior to September 24, 1954, Charles P. Poole desired to secure title to the cemetery in a corporation "so that it could be destroyed and abandoned and the real property transferred to the University of Oregon for building sites." At a meeting not known of or authorized or attended by a substantial number of the membership of Odd Fellow Cemetery Association, Poole, without authority of the membership, caused to be organized Pioneer Memorial Park Association (No. 1) and wrongfully caused those undertaking to act for the cemetery association to deed the cemetery to Pioneer Memorial Park Association (No. 1).

Pioneer Memorial Park Association (No. 1) never functioned in the operation of the cemetery, which remained in the possession of Odd Fellow Cemetery Association, and the latter association continued to operate it. After learning that a deed of the cemetery property had been executed and delivered to The Lodge, the plaintiff, during the summer of 1956, demanded a deed to the cemetery from The Lodge and was promised a deed by the directors of The Lodge "if plaintiff would change its name and omit the words, 'Odd Fellows' [sic] therefrom and establish themselves as adequately prepared to care for the cemetery in the future". The plaintiff agreed to comply with these conditions and The Lodge, for the purpose of carrying out the agreement, did on or about the tenth day of January, 1957, execute and acknowledge a deed leaving the name of the grantee blank so that the name of the plaintiff when changed would be inserted therein as grantee. Thereafter Odd Fellow Cemetery Association at its annual meeting in the spring of 1957 changed

its name to The Eugene Pioneer Cemetery Association and filed the record thereof with the corporation commissioner and notified The Lodge, through its representative Poole, of such action and Poole stated that he would secure the deed for the plaintiff in a short while. "Thereafter, during 1957, plaintiff raised $2,500 for the erection of a building upon the premises and by work donated by members of plaintiff, erected a building and restroom at a cost of substantially $5,000, all with knowledge of defendants and reset over 400 tombstones, removed fallen trees, cut brush and brought the cemetery into a state of good condition, thus demonstrating that it was capable of maintaining and caring for the cemetery, all of which defendants knew." Thereafter Poole in association with certain representatives of the University of Oregon and without the knowledge of his fellow directors, caused to be organized the Defendant Association and fraudulently inserted its name as grantee in said deed.

As conclusions of law the court found that the title to the cemetery was vested in fee simple in Odd Fellow Cemetery Association by the order of the county court of Lane County, Oregon, and consented to and acquiesced in for a period of 27 years by The Lodge, and that the plaintiff has been entitled to a deed to the property at all times since 1930; that Pioneer Memorial Park Association No. 1 was never in good faith organized for the purpose of conducting a cemetery, and was not a qualified grantee of a cemetery and the deed to that association was null and void; that defendant Pioneer Memorial Park Association is not an organization qualified to own and operate a cemetery and was not in good faith organized for such purpose and the deed to said defendant is null and void; that The Lodge is obligated to convey the ceme-

tery to the plaintiff by reason of its consent to the order of the county court and the possession, care and improvement of the cemetery by the plaintiff for more than 27 years, as well as by the express agreement upon which plaintiff relied and upon the faith of which plaintiff thereafter made such improvements; that the defendant Pioneer Memorial Park Association was organized for the sole purpose of enabling the University of Oregon to acquire title to the cemetery and to destroy it as a burial place, and that such defendant had full knowledge of the agreement of The Lodge to convey the cemetery to the plaintiff and of the improvements thereon made by the plaintiff in 1957, and that, for reasons previously stated, the deed from The Lodge to the defendant Pioneer Memorial Park Association is a nullity and should be set aside.

In our opinion, the evidence does not support the decision of the court below.

The plaintiff was never at any time the owner of the entire cemetery. Whatever title it may have had it acquired through the proceeding in the county court of Lane county in 1930. The statute pursuant to which that proceeding was brought, Oregon Laws 1927, ch 237, provided in section 1:

> "Whenever a majority of the lots as platted or laid out in any cemetery heretofore established or any part thereof has been sold without the owner or owners of or persons in control of said cemetery having made provision for the establishment of an adequate endowment fund for the perpetual maintenance, upkeep and beautification of said cemetery and of the lots therein, the avenues, streets, alleys, walks, driveways and parks therein may be vacated or altered and replatted into lots which may be sold for burial purposes in the manner provided in this act. * * *"

To accomplish this it was provided that a verified petition might be filed with the county court of the county in which the cemetery is situated by the owner or owners or persons in control of the cemetery or by a group of 20 or more persons owning lots or who have relatives buried therein. A procedure was provided for giving notice by publication of a public hearing on such petition. Section 3 provided:

"At the time specified for such hearing the court shall consider and hear any evidence introduced in favor of such change and any and all objections thereto and, after a full hearing thereon, may allow the said proposed change and replat in whole or in part. If such proposed change be allowed, either in whole or in part, an order allowing same shall provide that title to any new lots created by said proposed change by the alteration or vacation of any avenues, streets, alleys, driveways, walks or parks, or any part thereof, shall be vested in the owner or owners of the fee of the part of said cemetery sought to be vacated in trust for the purpose specified in this act, or vested in any association which may be formed for the purpose of taking over such cemetery and operating and maintaining the same in accordance with the provisions of this act."

The only part of the proceedings in evidence is the order of the county court dated May 17, 1930. Among other things, it recites that Spencer Butte Lodge No. 9, I.O.O.F., "consented to and approved the proceedings undertaken by these petitioners." It orders and adjudges "that all alleys, streets, and public grounds in said cemetery, marked in red on the proposed plat filed in this proceeding be and they hereby are vacated * * * and the title of the land covered by [the vacated portions] is hereby vested in said Odd Fellow Cemetery Association." There follows a par-

ticular description of the vacated portions which comprise roughly one-eleventh of the entire area.

█ It is suggested by the defendants that the statute is unconstitutional because it authorizes the divesting of title to land without compensation to the owner and that the record of the proceedings in the county court in evidence fails to show that the requirement of notice of the hearing was complied with. For reasons that will hereinafter appear, we pass by these contentions. It is sufficient now to say that the plaintiff's title to a small portion of the cemetery could not ripen into ownership of the whole simply by reason of its exercise of the privilege of "taking over such cemetery and operating and maintaining the same in accordance with the provisions of this act", no matter how long continued. This is not a suit to establish title to real property by adverse possession. As long as the plaintiff retained title to the vacated portion and continued to render the service for which it was organized, it no doubt had the legal right to exclude anyone else, even the owner of the remainder, from interfering with it in the exercise of the privilege of administering the entire cemetery pursuant to the authority granted it by the statute; but that was the extent of its interest.

The plaintiff's brief sets forth the following proposition:

"Where land is surrendered to the possession of a cemetery association when it is already a cemetery and the organization receiving the possession of the land continuously occupies it and manages and controls it as a cemetery, title to the cemetery is vested in the organization receiving the possesison [sic] and occupying it by acts in pais."

In support *Bitney v. Grim,* 73 Or 257, 261, 144 P 490, is cited. In so far as this case deals with cemetery law, it merely holds that indefiniteness of description of land in a deed dedicating land for cemetery purposes is immaterial where the ground has been, and continues to be, actually occupied as a place of burial. There may be such a dedication without a deed or writing of any character, but proved solely by "acts *in pais* going to show that the owners intend to donate the use for a public purpose, and that the public has accepted and used it for that purpose." *Campbell v. City of Kansas,* 102 Mo 326, 339-340, 13 SW 897, 10 LRA 593. See also *Hines v. Tennessee,* 126 Tenn 1, 149 SW 1058, 42 LRA NS 1138; 10 Am Jur, Cemeteries, 489, § 6. There is no dispute here over the dedication of the ground for a public purpose. The question we have to decide is who owns the cemetery and who has the right to administer it, and *Bitney v. Grim* has no bearing on that controversy.

■ All this becomes academic, however, if the bargain and sale deed from Odd Fellow Cemetery Association to Pioneer Memorial Park Association (No. 1) executed in 1954 operated to transfer to the latter whatever interest the former may have had at that time. It should be observed at this point that no contention has been made that a conveyance of its interest in the cemetery property was ultra vires the cemetery association. The only allegation in the pleadings attacking the deed in question is found in the reply and is to the effect that the execution of that deed was unauthorized and was brought about by "certain people undertaking to represent the plaintiff" but who had no authority to do so.

We proceed to examine this question.

The testimony of Mr. Ben Dorris, a witness for

the plaintiff, sufficiently explains the *raison d'etre* for Pioneer Memorial Park Association (No. 1) and the motive for transferring to it the interest of Odd Fellow Cemetery Association. The plaintiff not only vouched for Mr. Dorris' credibility by calling him to the stand as its witness, but plaintiff's brief pays him a tribute as a public spirited citizen and man of integrity, which we have no doubt is justly deserved.

Mr. Dorris was president of Odd Fellow Cemetery Association from 1947 to 1954. He testified that every lot owner was a member of the association, but no dues were ever collected. He described at some length the difficulties experienced by the association in its efforts to raise funds sufficient to maintain the cemetery properly and the ultimate failure of those efforts. The aid of the University of Oregon was sought to be enlisted at various times and with various presidents. Mr. Dorris would argue with them that the land was very valuable, that the university claimed that the cemetery was an eyesore and a nuisance and should do something about it. For the reason, among others, however, that the University's funds could not properly be used for the cemetery purposes, the aid was not forthcoming. According to Mr. Dorris, an investigation developed that out of 4,000 actual burials, only 1,800 graves were registered as required by law, and that there had been many transfers of lots from one lot holder to another not sanctioned by the cemetery association and the record of which was incomplete, and that laws relating to cemeteries were not being observed by the association. Most of the work of caring for the cemetery was donated, and, in the end, as Mr. Dorris testified: "[A]ll we have been able to do is to just give it an annual cleanup for the week before Memorial day." As he further said: "When

we lost the last man that could use a scythe we had to quit all that work around in there."

In that situation Mr. Dorris sent out a notice of the annual meeting of Odd Fellow Cemetery Association to be held on March 1, 1954. The notice took the form of a letter to members of the association and in addition notice of the meeting was published in the Eugene Register-Guard.

Mr. Dorris' letter reviewed the history of the association and the problems facing it. It stated, among other things: "Cemetery law states that when a cemetery has been left in an overgrown and uncared-for condition for a period of five years it may be declared an abandoned cemetery and legal steps taken for disposal of it.[①] This possibility has to be faced." Speaking of the failure to obtain bequests, legacies and gifts in sufficient amounts to establish a perpetual care fund, the writer said: "It is probable that some large gifts would have been made had the Association's Articles of Incorporation and title to the property offered greater security to such gifts or bequests." The unsuccessful efforts to induce the University of Oregon to take over the cemetery were recited. In the agenda for the meeting were included methods of financing which should be considered, the election of trustees and reincorporation and revision of bylaws.

The trustees elected at the meeting, whose names we have given above, were all, Dorris testified, nominees of the board which was going out of office agreed upon by a group of about a dozen people. The nominees were chosen as representing different elements of the community—the general public, the lot owners, the pioneers, the veterans, and the Odd Fellows' Lodge. Mr. Poole's name was suggested by The Lodge.

[①] See Oregon Laws 1953, ch. 298.

Mr. Dorris testified that it was a "slate" and that he informed the meeting of that fact and also that nominations were open from the floor. A ruling was made that anyone present could vote regardless of the payment of dues. Mr. Dorris testified: "There wasn't a dissenting vote on anything."

It was these trustees, together with two others, Nina N. McCornack and Harold V. Johnson, Jr., who, as above stated, on June 9, 1954, executed the articles of incorporation of Pioneer Memorial Park Association (No. 1). Mr. Johnson is an attorney who theretofore had been consulted by the trustees of the cemetery association regarding the association's legal status and rights and obligations.

The minutes of this meeting are not in evidence.

On August 23, 1954, a special meeting of Odd Fellow Cemetery Association was held in Fenton Hall, University of Oregon campus. The minutes of this meeting show that the following officers and board members were present: Lindeland, McCornack, Kreamer, Bartholomew, Leighton, attorney Johnson, cemetery manager Poole. Leighton had taken the place of Poole as a trustee. The secretary called the roll of qualified members as of this date numbering 129. 51 members were found to be present. The minutes of the March first meeting were read and approved.

President Lindeland called for the reading of the motion made by T. H. Fenton at the March first meeting. The motion was read as follows:

" 'T. H. Fenton moved that the newly elected Board of Directors investigate different plans to bring before the members for discussion in ninety days and that they be authorized to hire an attorney to be sure the plans are legal. Mr. Otto Rowland seconded the motion. Motion carried unanimously.' "

A statement was made by attorney Johnson in which, among other things, he suggested "reincorporation of the association and clearance of title to all of the cemetery property." He further stated that consultation with the Odd Fellows Lodge had shown that The Lodge was willing to vest all of its interest and title in a new corporation properly organized and that it would not vest such interest in the present Odd Fellow Cemetery Association. President Lindeland pointed out that the board of trustees had filed new articles of incorporation under the name "Pioneer Memorial Park Association" and had obtained title to all of the interest of The Lodge.

President Lindeland announced that the board has given some consideration to a plan which would involve compression of the cemetery into a smaller area, but the multiplicity of details involved precluded any report on it as yet; that the board was not then recommending any plan; and that the board had not discussed any plan for the removal of the cemetery in toto. He further stated that the board was making one recommendation at this time, namely: "That the association join its interests with those already obtained from the Odd Fellows Lodge by the formation of the Pioneer Memorial Park Association." Mr. Poole moved " 'That the Trustees of the Odd Fellows [sic] Cemetery Association be hereby authorized to carry out whatever procedures are necessary to vest all of the interests, responsibilities, powers, and authority of the Odd Fellows [sic] Cemetery Association in the Pioneer Memorial Park Association.' " The motion was duly seconded and, after discussion, was put to a vote by a show of hands and carried 45 for, none against.

Pursuant to this action, the trustees of the cemetery

association, as previously stated, under date of September 24, 1954, executed a bargain and sale deed of that association's interest in the cemetery to Pioneer Memorial Park Association (No. 1). This deed was recorded September 29, 1954.

We can find nothing in the evidence to justify the charge of fraud or usurpation in the election of the new board of trustees of Odd Fellow Cemetery Association, nor in the organization of Pioneer Memorial Park Association (No. 1) and the transfer to it of the interest of the cemetery association in the cemetery. There was no concealment. On the contrary, all was done openly and in the broad light of day. The accusation of fraud against Mr. Poole could have been leveled with equal justice against Mr. Dorris. It may not have been necessary to organize a new corporation in order to put the cemetery on a more secure financial basis, but those who considered it necessary, and they included Mr. Dorris, were acting under legal advice and were undoubtedly sincere in their belief. It is true that Mr. Poole and others on the board of the new corporation thought that solution of the cemetery problem lay in an arrangement with the University of Oregon which called for reduction of the cemetery in size and incorporating it into the campus of the university. But their view of this subject, which they made no attempt to conceal, is no evidence of fraud nor, as we shall later show, did it vitiate the deeds to the corporation.

In March, 1955, the board of directors of Pioneer Memorial Park Association (No. 1) called a meeting for the purpose of discussing the affairs of the cemetery including the feasibility of such a plan. Notice of this meeting was given in the press to "lot owners and interested persons". A committee representing the

lot owners appeared and voiced their objections "against condensing, removal of, or sale of any part of the cemetery." As we have seen, it was this feeling among the lot owners which led to the dissolution of Pioneer Memorial Park Association (No. 1) in January, 1956.

The finding of the circuit court that the new corporation never functioned in the operation of the cemetery is contrary to the facts as disclosed by the evidence. It not only did what it could with the means at its command to care for the cemetery grounds, but for the first time in many years administration of the cemetery's affairs was on a businesslike basis. Meetings of the board were held and minutes were kept and records were kept of burials and removals. It should be added that in the work of caring for the grounds, as well as in the endeavor to raise funds, the association had the cooperation of lot owners, among whom were Dolph Howard and Edwin Hansen, two of the principal witnesses for the plaintiff.

■ According to the testimony of Mr. Poole, the reconveyance of the cemetery property to The Lodge by Pioneer Memorial Park Association (No. 1) in January of 1956 was made pursuant to an agreement with The Lodge that this would be done in the event of a dissolution of the former corporation. Plaintiff asserts in its brief that this deed to The Lodge is void and conveyed no title because The Lodge was "not organized for a cemetery association, or to operate a cemetery association", but that it was "nothing but a fraternal organization." The pleadings admit that The Lodge is a corporation. Its articles of incorporation are not in evidence and we are not told under what statute it was organized, but in view of the fact that for many years The Lodge did hold title to and ad-

minister the cemetery involved in this case and that some time prior to 1930 it acquired another cemetery, which, apparently, it still owns and operates, we are not prepared to accept the implication that all this has been done without authority of law.

The authorities which counsel cite as supporting this contention, with one exception, stand for the principle that the power of the body in which the legal title to a cemetery rests to sell or convey the land to another is restricted. As stated in 14 CJS 80, Cemeteries, § 21:

> "As it has been held to have been well stated in Corpus Juris, lands once legally devoted to, and used for, burial become appropriated to a public purpose in such a sense that the power of the body in which the legal title may rest to use or alienate the same while such dedication remains in force is restricted, and, except as provided by statute, land dedicated for, and used as, a burying ground cannot be sold. However, in the absence of statutory prohibition, subject to the rights of the lot owners, the fee of a cemetery may be lawfully sold, and so the owner of a cemetery or a cemetery association may sell the land to another person or association for cemetery purposes. * * *"

See also *Wolford v. Crystal Lake Cemetery Ass'n.*, 54 Minn 440, 56 NW 56; *United Cemeteries Co. v. Strother*, 332 Mo 971, 61 SW2d 907, 90 ALR 438. The other decision relied on is *Dunlap v. Union Lodge No. 15, I.O.O.F.*, 129 Kan 287, 282 P 715. This was a suit in equity brought by owners of burial lots in a cemetery which for many years had been owned and cared for by the local Odd Fellows Lodge in Emporia, Kansas, to enjoin the sale of the cemetery to a corporation chartered to conduct a cemetery business. The court held against the plaintiffs substantially on the ground that when the lodge in pioneer times under-

took to supply the public need of a cemetery for the people of its community it did not bind itself to continue that activity forever, and that it was exclusively within the province of the lodge to determine for itself that, when the duties incident to the management of a cemetery had become too onerous and no longer possible for the lodge to discharge, it would rid itself of the responsibility by conveying the cemetery to a corporation organized to carry on that sort of business. There is certainly nothing in this decision which affords any justification for saying that the Odd Fellows Lodge which is a defendant in this case is not a body legally empowered to hold title to, and manage, a cemetery even though it be plain that it would rather be free of that burden. Morever, this contention of the plaintiff is wholly inconsistent with the allegations of the reply to the answer of the Defendant Association that the plaintiff "compelled the said corporation [Pioneer Memorial Park Association (No. 1)] to reconvey said premises described in the complaint to the said defendant lodge," and that by reason of the deed to The Lodge "the property was cleared of said encumbrances created" by the previous deeds from Odd Fellow Cemetery Association and The Lodge to Pioneer Memorial Park Association (No. 1). We think that the deed in question was valid.

We are brought thus to the contention that The Lodge in the summer of 1956 entered into an enforceable oral agreement to convey the cemetery to the plaintiff.

The alleged agreement was entered into at a meeting in the Odd Fellows' Temple sometime in the summer of 1956 between The Trustees and representatives of Odd Fellow Cemetery Association. The Trustees were Charles P. Poole, Henry L. Hilliard and Frank L.

Peterson. Herbert E. Walker, Secretary of The Lodge, was also present. The representatives of the cemetery association were Dolph Howard, Ruth Lake Holmes and Edwin M. Hansen.[①] Poole and Howard acted as principal spokesmen for their respective groups.

Howard's testimony is to the effect that he told The Trustees that they had come to discuss the matter of the cemetery association's taking over the entire handling of the cemetery and to ask that The Lodge give the cemetery association a deed to the cemetery property. He said that The Trustees told them that if they would change the name of the cemetery association so as to remove the words "Odd Fellow" and would demonstrate that they were prepared to care for the cemetery properly in the future, The Trustees would give them a deed to all the interest of The Lodge in the property and that Howard and the others in his group agreed to change the association's name and proceeded to do so.

Towards the end of the case Howard was recalled by the Defendant Association as an adverse witness and testified that at the meeting in the summer of 1956 between The Trustees and the representatives of the cemetery association he asked for a deed to the portion of the cemetery which the cemetery association had previously owned and that that was the only deed that he asked for.

Howard further testified that he talked with Poole a number of times about the matter in 1957. He did not know at that time that a deed had already been

---

[①] At a meeting of Odd Fellow Cemetery Association on February 25, 1956, Dolph Howard, Ruth Lake Holmes, and Edwin M. Hansen were elected trustees of the association. A question is raised in the brief of the defendants as to the validity of this election. We find it unnecessary to resolve this question and for the purposes of the opinion assume that they were the duly authorized representatives of the cemetery association.

prepared by The Trustees. We quote from his testimony:

"Q Well, you knew all the time, didn't you, that the only thing Mr. Poole told you was that he would take the matter up with the Lodge? In other words, he would take the conversation with you up to the Lodge and discuss it with the brothers? You knew yourself, didn't you, that Mr. Poole couldn't give you any deed or any other Trustee?

"A I never expected him to, but I did expect him to take the matter up with the Trustees as he said he would."

Again this appears:

"Q Mr. Howard, as a matter of fact, those vacated streets and alleys that were mentioned in this court order of 1930, those are the ones you were referring to, are they not?

"A Those were the ones that we—

"Q That you asked for?

"A When we went up and met with the Trustees?

"Q Yes.

"A Those were primarily, that was our mission up there to see them."

Hansen's testimony was generally to the effect that "by improving it and taking care of it [the cemetery] and changing its [the cemetery association's] name that that would be all their requirements."

Mrs. Holmes, who was secretary of the cemetery association, testified that they were told that their association would get a deed "When we had changed the name and officially recorded it with the Corporation Commissioner and definite proof of that was on record." She said that this was their sole requirement.

Poole swore that the only thing he could possibly remember about what was said at the meeting was

that Howard demanded a deed and made the state-
ment that he "would carry it to the Supreme Court"
if we didn't give them a deed right away. He said that
he had never promised Howard or anyone else a deed
"only through the action of the Lodge", that The
Trustees "are the spokesmen of the Lodge in such
matters, but they are the ones that instruct us to do
what needs to be done. To issue a deed, the Trustees
have no authority. Only on instructions from the
Lodge." He conceded that he might have indicated to
Mr. Howard at some time that he would bring the
matter to the attention of The Lodge, but that any
opinion he expressed was purely personal and that he
was without any authority to give a deed. In response
to a question by the Court as to whether he ever told
representatives of the cemetery association that he
would recommend that The Lodge execute a deed to
the cemetery association he said "I can't swear that
I ever did that. I don't think I ever did." He stated
that at the meeting in question the subjects of the
cemetery association's changing its name and demon-
strating its ability to care for the cemetery were dis-
cussed, but said that these were requirements which
were to be met before The Trustees would deal with
Howard and his associates and added that another
requirement was that the cemetery association should
incorporate. He further testified that Howard said
that the cemetery association would not change its
name. Referring to testimony of Howard that the
latter in the spring of 1957 told Poole that the name
had been changed, the witness testified that a few
days after this conversation he examined the records
in the office of the corporation commissioner in Salem
and found that no such change had been made.

The foregoing testimony was given by Mr. Poole

on direct examination as a witness for The Lodge. On cross-examination by counsel for the Defendant Association he was asked further about the requirement that Odd Fellow Cemetery Association incorporate and testified as follows:

"Q In other words, you are sure from what was said that Mr. Howard understood that they wouldn't be given any consideration unless they reincorporated?

"A Absolutely.

"Q And that didn't mean just changing the name?

"A No, that didn't mean just changing the name.

"Q That meant filing a modern corporation?

"A That's right.

"Q And had they ever done that so far as you know?

"A Not so far as I know."

He testified that the cemetery association's representatives walked out without saying goodbye, appeared to be angry, and used "words to the effect that they would have a lawsuit before they would do certain things."

Hilliard's testimony tended to support the claim of the plaintiff. His best recollection was that the trustees agreed that if the words "Odd Fellow" were taken out of the cemetery association's name and the cemetery association incorporated under the laws of Oregon, The Trustees would deed the property to the cemetery association. Regarding the deed which he signed on January 5, 1957, he testified that he intended to deed the premises to the Odd Fellow Cemetery Association when they changed their name and incorporated and that he did not know that the cemetery association was already incorporated.

Peterson testified that no promises of any kind

were made and that Poole had told the meeting that unless the cemetery association took out the words "Odd Fellow" from their name and incorporated, The Trustees would not consider giving the cemetery association a deed, and that Howard said that the cemetery association would sue The Trustees before it changed its name. Peterson further testified that it was stipulated that the cemetery association would have to prove itself worthy to take over the association. He said that the deed of January 5, 1957, was signed with the understanding that a group of men, of whom Leighton was one, were forming a corporation to buy the cemetery, that prior to signing the deed there were numerous discussions among The Trustees, that he had not heard anything from Odd Fellow Cemetery Association since the meeting with them in the summer of 1956, that prior to delivery of the deed Poole told him about an offer of $100 for the property, but that Poole was holding out for more and finally that Poole informed him of an offer of $500, that this was thought sufficient, and The Trustees told him to go ahead and deliver the deed. He did not know the name of the grantee until after the first of 1958.

Walker's testimony was in substance that Howard's group demanded a deed "in accordance with a promise"; that he "never knew of any promise being made at that time"; that Howard's group were told that if they "would incorporate their association according to the present laws of cemeteries for Oregon, the Lodge would give them a deed". There were no other conditions except that they "were to be competent to take care of it." He could not remember whether anything was said about changing the name and was under the impression that the name had already been

changed. He was asked whether Howard said that his group would refuse to incorporate and answered that Howard claimed that they were already incorporated and had been so advised by their attorney. He repeated that there were no promises, but that The Trustees said that if the conditions stated were met "the Lodge would consider giving them a deed."

It appears from the testimony that the deed of January 5, 1957, with the name of the grantee blank, was in the possession of Mr. Poole, who had become chairman of the board of trustees of The Lodge, until October or November of 1957, when it was placed in escrow with a bank in Eugene, where it remained until it was delivered to the Defendant Association on or about December seventeenth. As previously indicated, Poole testified it was the expectation when the deed was signed that it would be delivered to a new corporation which a group of men, including Mr. Ralph Leighton, a retired member of the faculty of the University of Oregon, were organizing, though whether the deed would be delivered to this new corporation depended on whether a reasonable price was offered for the cemetery property. The price paid was $500 and the source of the funds was a check of the University of Oregon Development Fund made payable to the Oregon State Board of Higher Education. Poole testified that the other trustees authorized him to insert the name of the grantee in the deed. Peterson, as we have seen, testified that he did not know the name of the grantee until later, although he did authorize delivery of the deed for $500. But Hilliard intended, according to his testimony, to deed the premises to Odd Fellow Cemetery Association after it incorporated and changed its name and not to anybody else. He was not a trustee in December, 1957, and it

was quite a while before he learned the name of the grantee. Howard testified that in a telephone conversation with Peterson after the deed had been delivered "I asked him how come and he said it was his impression that it was to go to the Eugene Cemetery something and he didn't know what." Howard further testified that he also talked to Hilliard about the transaction and said to Hilliard "that looks darn funny to me" and Hilliard agreed that it did "look kind of funny".

We have already called attention to the fact that delivery of the deed to the Defendant Association was ratified by The Lodge.

A letter dated September 18, 1956, written to Poole by Mr. Carl Coad, as attorney on behalf of the cemetery association, stated, in substance, that the association claimed that it still owned the interest in the cemetery which it had previously transferred to the Pioneer Memorial Park Association (No. 1). The letter stated: "Some oral discussions have been had by the Trustees of the Odd Fellow Cemetery Association with officers of the Lodge, and it is my understanding that the Lodge is agreeable to transferring the residual interest in the Cemetery to the proper claimants thereto, but that there has been an assertion made that the Odd Fellow Cemetery Association is not a responsible corporation with which to deal." After stating that the cemetery association was a corporation in good standing and "the only organization that can be charged with the trust of handling the replatted lots and trust funds arising from sales of such lots", the letter suggested a meeting with Mr. Poole's attorney and concluded that if this were not done suit would be brought to set aside conveyances heretofore made "as being in violation of the trust terms imposed

by the statutes." Mr. Howard said that he did not write or dictate the letter. There was no claim that the letter was written without authority and it was admitted in evidence without objection.

There is also in evidence the minutes of the annual meeting of Odd Fellow Cemetery Association held on March 2, 1957, in which the following appears: "Mr. Kincaid asked when our deed from the Lodge will be coming through. Mr. Howard said that we will have to have a civil suit to quiet title and that if we will bide our time it will probably not be necessary."

We think it well at this point to call attention to the terms of the agreement as alleged in the pleadings.①

The amended complaint alleged that The Lodge, desiring to disassociate its name from the cemetery, requested Odd Fellow Cemetery Association to change its name so as to omit the words "Odd Fellow" and agreed that if this were done The Lodge would convey the cemetery to the cemetery association; and that the consideration for the deed agreed to be given the plaintiff was "the work, money, and labor which the plaintiff under its previous name and under its new name had done and performed and the money it had gathered by donations and otherwise for the improvement and betterment of said cemetery." The pleading then recites the services rendered by the plaintiff since its organization in 1930, including, specifically, the collection of cash in excess of $2,700, the resetting of 250 markers and monuments, the construction of a maintenance building in the cemetery by an expenditure of a large amount of labor and $2,700 cash, the placing of a bronze plaque on this building at a cost of $500, and,

---

① It is not without significance that the initial complaint—which purports to state a cause of suit to remove a cloud from plaintiff's title and to which a demurrer was sustained—contains no reference to the alleged agreement.

in general, the use of all the means within its ability to rehabilitate and maintain the cemetery. The pleading continues:

"that it was the purpose and desire of the defendant lodge and the defendants trustees in consideration of the said work and effort to insure the continued operation of said cemetery and to compensate the plaintiff for its work, as aforesaid, in maintaining said cemetery and administering the same; that said deed was executed and was to be delivered to plaintiff and that this was the agreement between the plaintiff and the said defendant lodge and defendants trustees."

In the reply, after repeating the stipulation as to the change of name, it is alleged "that the said defendant lodge and the defendant trustees would convey the premises to the plaintiff and to show to the said defendants lodge and trustees that they were so incorporated that they could handle the business of administering the cemetery."

■ The specific performance of a parole contract for the conveyance of real estate will not be enforced under any circumstances unless the terms of the contract are shown by full, complete, and satisfactory proof to have been so precise that neither party could reasonably misunderstand them. *Benson v. Williams,* 174 Or 404, 433-434, 143 P2d 477, 149 P2d 549; *Woolsey v. Draper,* 103 Or 103, 111, 201 P 730, 203 P 582; *Goodin v. Cornelius,* 101 Or 422, 440, 200 P 915; *Goff v. Kelsey,* 78 Or 337, 341, 153 P 103; *Wagonblast v. Whitney,* 12 Or 83, 88-89, 6 P 399; *Odell v. Morin,* 5 Or 96, 98.

■ Even the pleadings are ambiguous as to the precise terms of the agreement. The amended complaint, for example, does not contain the allegation found in

the reply as to showing The Lodge and The Trustees "that they were *so incorporated* that they could handle the business of administering the cemetery." (Italics added.) At best, this is a vague and indefinite statement.

Putting this to one side, there is too much uncertainty in the evidence respecting the terms of the alleged agreement to satisfy the demands of this well established rule. According to Mrs. Holmes the only requirement imposed was the change of name of Odd Fellow Cemetery Association so as to omit the words "Odd Fellow". But Howard and Hansen testified that it was also required that their association demonstrate that it was, to quote Howard's language, "adequately prepared to care for the cemetery in the future." Against the background of the cemetery's history, the meaning of this stipulation is far from clear. The main difficulty had always been the lack of a fund for perpetual care. At times voluntary contributions of labor and money by lot holders and others brought about temporary improvement in the condition of the cemetery. For example, in 1954, after the election of the new board of trustees, according to the testimony of Mr. Poole, the cemetery was cleaned up with the aid of trucks loaned by the city of Eugene and the University of Oregon. A full load and two partial loads of beer bottles and two partial loads of brush were removed. The city also sent a grader and graded the streets. An organization called the "Stinkers" helped with this work and also commenced the building of a fence which, however, was not completed. After the dissolution of Pioneer Memorial Park Association (No. 1) the dissident members of the cemetery association apparently took over the care of the cemetery and a more or less sustained effort was made to keep it in

good condition. It was during this time that some of the work of resetting of the headstones and monuments was carried on and the donations collected, as alleged in the amended complaint. None of these accomplishments, however, nor all of them put together, were such as to give anyone definite assurance as to the future, or that in the course of time the interest in maintaining the cemetery (which, we think, was undoubtedly stimulated by the controversy which had arisen) would not again flag, as it had done in the period from 1930 to 1954, and the cemetery revert to its former sad condition. In view of all this it is impossible to say whether the requirement of a showing by the plaintiff that it could adequately care for the cemetery in the future meant simply that what had been done up to filing of this lawsuit would suffice, or that the cemetery association would establish such a financial position for itself, that, regardless of the continued interest of individuals, there would be reasonable assurance that the property would be adequately cared for and maintained. In other words, the ideas of Mr. Howard, on the one hand, and of Mr. Poole, on the other, as to what would constitute a sufficient demonstration of the cemetery association's ability to maintain the cemetery in the future might have been entirely different.

"Whenever it appears that material matters are not clear, certain, and complete, but are left by the parties so obscure and undefined that the court cannot say whether or not the minds of the parties met upon all the essential particulars, or if they did, the court cannot say exactly upon what substantial terms they agreed, the case is not one for specific performance. * * *" 49 Am Jur 35, Specific Performance, § 22. And see *Alexander v. Alexander,* 154 Or 317, 333, 58 P2d 1265.

■ In addition, there is uncertainty arising from the testimony of Mr. Howard and the letter of Mr. Coad as to whether the parties were discussing the giving of a deed to the entire cemetery, the portion thereof acquired by the plaintiff through the county court proceedings in 1930, or the portion title to which still remained vested in The Lodge after those proceedings were taken. This defect in the evidence alone would be sufficient reason for denial of the remedy of specific performance. *Hyland v. Oregon Agricultural Co.,* 111 Or 212, 219, 225 P 728; *Woolsey v. Draper,* supra; *Knight v. Alexander,* 42 Or 521, 523-524, 71 P 657.

The alleged agreement was for the conveyance of an interest in real estate and not being in writing was void (ORS 41.580) unless there was such part performance by the plaintiff as to take it out of the statute of frauds. The plaintiff points to the improvements made by it, including the resetting of headstones and monuments and the construction of a building for housing tools and equipment at a cost of more than $5,000, and the placing of a plaque on the building at a cost of $500 as evidence of part performance.

■ There is no room for a contention that the plaintiff took possession pursuant to the agreement. Such an act may constitute sufficient part performance. *Young v. Neill,* 190 Or 161, 178, 220 P2d 89, 225 P2d 66; *Stalker v. Stalker,* 78 Or 291, 298, 153 P 52. But in this case the plaintiff's position in this regard remained precisely the same after the alleged agreement as before. We do not decide that it had possession at any time after 1954, but merely that if it had nothing was changed after the summer of 1956 and so it cannot be said that it took possession pursuant to an agreement.

■■ There remains the question of the making of valuable improvements. So far as maintaining the cemetery in good condition is concerned, it was conceded by Mr. Howard that he and his associates were exercising the owner's privilege of doing this work. The headstones and monuments were reset in the spring of 1956. The maintenance building was not erected until 1957, but it had been planned for a long time before that.

The basis for the jurisdiction of equity to enforce specifically an oral contract for the sale of land was well stated by Mr. Justice LORD in *Wagonblast v. Whitney*, supra, at 87-88, as follows:

"The ground of the jurisdiction is equitable fraud. It is based upon the just principle that when acts of part performance have been done in pursuance of and in reliance on the verbal contract, with the knowledge and consent of the other party, and the relations of the parties are so changed by reason thereof as to prevent a restoration to their former condition, it would be a fraud, and encourage bad faith to permit the statute to be interposed as a defense whereby one party would reap the benefit of the acts of part performance, and the other be left without any remedy, and liable for damages as a trespasser. (3 Pomeroy Eq. Juris. § 1409, n.) Equity will not permit a party to retain an advantage thus gained upon the faith of a verbal agreement, while he repudiates its obligations under cover of a statute. In a word, it will not allow the statute to be used as a cover for fraud and bad faith. * * *"

It is familiar law, as we have frequently said, that the acts of part performance must be exclusively referable to the contract; in other words, they must be such as would not have been done except for the contract. *Jewell v. Harper,* 199 Or 223, 234, 258 P2d

115, 260 P2d 784, and cases there cited; *Tiggelbeck v. Russell,* 187 Or 554, 567, 213 P2d 156.

It follows that acts done before the alleged agreement was entered into could not, under any circumstances, have been done in pursuance of the agreement. But here the same is true of what was done afterwards, including the construction of the maintenance building, for it is clear that the plaintiff was acting all along under a claim of right and without regard to any promise of a deed from The Lodge. Its conduct, its pleadings, the evidence, and its briefs in this court and in the court below show this to be the fact beyond any question. Indeed, we think that, though not avowed, it is implicit in the testimony that the improvements for which the plaintiff was responsible and its activity in collecting funds and securing subscriptions for funds were prompted in part by the motive to bolster its claim that it owned the cemetery and that it had the exclusive right to administer it.

■ The evidence discloses a somewhat anomalous situation as to the change of name of the plaintiff. Although the plaintiff's witnesses testified that they agreed at the meeting with the representatives of The Lodge that Odd Fellow Cemetery Association would adopt a new name omitting the words "Odd Fellow", the record discloses that at the annual meeting of the cemetery association in March, 1956, which, of course, was prior to the date of the alleged agreement, the association had voted to change its name to The Eugene Pioneer Cemetery Association, the name which it now bears. The motion then adopted included a provision "that the secretary be instructed to so file the name at the proper time." It was not until the annual meeting on March 2, 1957, that the secretary

was instructed to formally register the new name with the corporation commissioner. Under date of April 26, 1957, the secretary did notify the corporation commissioner of the change of name. In these circumstances it is difficult to say that the name was changed in reliance on the agreement, but even though that were a tenable interpretation of the evidence, it would not amount to an act of part performance within the meaning of those words as they are understood in the law of specific performance of oral contracts relating to real property.

We conclude, therefore, that the claim of part performance is not supported by the evidence. For this and the other reasons above given, the prayer of the plaintiff for the specific performance of the alleged contract must be denied.

In our opinion the plaintiff in its corporate capacity has no right in or title to the cemetery. Our holding that it freely and voluntarily conveyed its entire interest to Pioneer Memorial Park Association (No. 1) in 1954 makes it unnecessary to determine the question whether the 1927 statute under which it assumed the task of managing the cemetery is unconstitutional and, if so, whether The Lodge waived the right to raise that question.

The Defendant Association in its answer prays for an injunction restraining the plaintiff from interfering with the management and control of the cemetery and requiring the plaintiff to turn over to it all books and records relating thereto.

The plaintiff contends that the deed of The Trustees to the Defendant Association is void because the latter corporation was not organized at the time that the deed was executed. Since the plaintiff has no title, legal or equitable, this is not a question on which

it has the right to be heard. We think it proper to say, however, that the objection is obviously without merit. 16 Am Jur 488, Deeds, § 88.

■ The plaintiff further contends that the deed is void because the purpose of the Defendant Association in acquiring title to the cemetery was to bring about its destruction in violation of the rule previously adverted to which restricts the right to alienate a cemetery for any other than cemetery purposes. As representative of the lot holders who are interested in the preservation of the cemetery intact and in the fulfillment of the trust, we think that the plaintiff is entitled to raise this question.

It is not disputed that individuals connected with or interested in the University of Oregon, as well as members of the Board of Higher Education, regard the proximity of the cemetery to the University's campus with something less than equanimity. In its worst state of neglect and disarray it was probably considered a nuisance; at best, an obstacle in the way of expansion of the campus. Two of the incorporators of the Defendant Association were and are still members of the Board of Higher Education and a present trustee of the association is secretary of the Board. It would be naive to believe that they are fired with zeal to manage a cemetery. Mr. Poole, possibly for a different reason, that is the impracticability of operating the cemetery properly without an adequate endowment fund, testified to three possible solutions of the problem—either that the cemetery be removed, or condensed, or that a mausoleum should be erected as a memorial in which the remains of those buried in the cemetery should be placed.

We are dealing here, however, with a case in which the cemetery was deeded to a nonprofit corporation

whose articles of incorporation authorize it to "maintain, conduct and operate cemeteries". It is bound by the law of this state as expressed by this court in *Bitney v. Grim,* supra, 73 Or at 262:

> "* * * Having been thus dedicated by the owner of the fee, the premises are subject to that use so long as bodies remain buried there and until they are removed by public authority or by friends or relatives. The state by the exercise of its police power can properly cause the abandonment of a cemetery and the removal of the bodies. Friends and relatives may also voluntarily remove their dead, and if all those who sleep there were thus taken away and its use as a place of sepulture entirely abandoned the character of the ground as a burial place would be lost. But until its depopulation as a city of the dead is complete by one or the other process, the ground dedicated for the last resting place of deceased persons must remain true to its dedication.  * * *"

The rights of plot owners and of those who succeed to their rights are secured, for, as stated in *Mansker v. Astoria,* 100 Or 435, 452, 198 P 199, 199 P 381:

> "* * * The right of burial is a privilege or license to be enjoyed so long as the place continued to be used as a burial ground, subject to municipal regulation and control, and legally revocable whenever the public interest requires: (citing cases)."

See also *City View Cemetery v. Salem Maus.,* 209 Or 199, 218, 305 P2d 379. These principles of the common law are now written into the statutes of this state. ORS 97.340, ORS 97.350.

There is nothing to indicate that the Defendant Association or its trustees intend to commit any unlawful act or any act contrary to the public policy of this state. Regardless of who owns the cemetery, it is entirely legitimate for them or for the Board of

Higher Education or the administrative officials of the University of Oregon to endeavor to secure the enactment of legislation which would provide for the removal of the bodies and their reinterment in another place and for the devotion of the land to other uses. Whether such legislation would be in the public interest is for the legislature to determine.

The point is, however, that the evidence does not support the charge that the conveyance to the Defendant Association was not for cemetery purposes. The cases cited by the plaintiff are of an entirely different kind. One involved an attempt to foreclose a mortgage on cemetery property. *Wolford v. Crystal Lake Cemetery Ass'n.*, supra; the other an attempt to enforce a power of sale in a deed of trust to such property, *United Cemeteries Co. v. Strother,* supra. In the former case the mortgage was held void. In the latter the court refused to permit the power of sale to be exercised, but held that the lien of the deed of trust was valid and that it "may be foreclosed in a court of equity where all rights growing out of burial can be protected". *United Cemeteries Co. v. Strother,* supra, 332 Mo, at 977. The court recognized that "[t]he owner of a cemetery has a perfect right to sell and convey the same as a cemetery to another person or company for that purpose." *United Cemeteries Co. v. Strother,* supra, 332 Mo, at 976. That is precisely what has been done here.

It is not deemed necessary for this court to issue an order restraining the plaintiff from interfering with the Defendant Association's right to possession and management of the cemetery or requiring the plaintiff to turn over any books and records that it may have and to which the Defendant Association is entitled. The rights of the parties having now been

adjudicated, it will be assumed that the plaintiff, whose affairs are in the hands of law abiding citizens, will not offer any resistance to the legitimate claims of the Defendant Association. The circuit court, however, is directed upon the remand to retain jurisdiction of the cause so that if difficulty of that sort should arise it can be met.

The decree of the court below is reversed and the cause remanded with directions to enter a decree in accordance with this opinion. No costs or disbursements will be allowed.

Mr. Justice O'Connell, being of the opinion that he is disqualified, took no part in the consideration or decision of this case.